## FIRE ASS'N OF PHILADELPHIA v. UNITED STATES.

## FIRE ASS'N OF PHILADELPHIA v. SMITH, Collector of Internal Revenue.

**Clv. A. Nos. 10743, 10744.**

United States District Court
E. D. Pennsylvania.

Sept. 26, 1952.

Clement J. Clarke, Jr., Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., for defendant.

GANEY, District Judge.

This case involves two actions brought to recover $71,548.77 plus interest alleged to have been erroneously paid by the taxpayer as income taxes for the years 1942, 1943 and 1944. For the three taxable years involved the issue in both actions is the same. Stated broadly the question posed is whether the taxpayer, an insurance company taxable under section 204 of the Internal Revenue Code, 26 U.S.C.A. § 204, could have included in its allowable deductions for income tax purposes the increase over the previous year in its reserve for losses recoverable on reinsurance placed by it with

non-admitted companies. The taxpayer claims that it may have done so.

From a revised stipulation of facts entered into between the parties, the exhibits presented to it, and the taxpayer's income tax returns, the court makes the following special.

### Findings of Facts.

1. The taxpayer, a company organized and subject to the laws of Pennsylvania, is engaged in the business of writing fire and allied lines of insurance on the stock plan throughout the forty-eight states and various territories of the United States. Its principal office and place of business is in Philadelphia, Pa.

2. In the years 1941 through 1944 it reinsured a portion of its insurance risks with admitted and non-admitted companies.[1] The reinsurance placed with the latter companies was excess coverage on marine risks, principally cargo coverage for particular voyages. All except a very small portion of this reinsurance was placed with London underwriters or London underwriters' agents. The amount of paid and unpaid losses, the liability for which had been reinsured by the taxpayer with non-admitted companies for those years, and for which it had claims against them in an equal amount, was as follows: 1941, $72,916.60; 1942, $134,365.48; 1943, $244,661.81; and 1944, $294,189.09.[2]

3. Pennsylvania has been requiring companies, such as the taxpayer in the instant case, authorized to do business in the State, with the exception of reinsurance placed with admitted companies, to maintain at least two reserve funds. The first must be equal to a certain pro rata percentage of the unearned premiums for all risks undertaken by the companies; the second must be equal to the unpaid losses, for which they are primarily liable, claimed to have been sustained by the insured. The purpose of the latter reserve is to cover contingent liabilities for losses; that is, the possible default of the non-admitted companies on their obligations to the local company concerning the reinsurance ceded to them. Thus Pennsylvania is one of those states which maintains the fiction that, as far as reserve funds are concerned, insurance retained and reinsurance ceded to non-admitted companies are the same.[3]

4. When an insurance company, subject to the laws of Pennsylvania, files an annual statement of financial conditions and business transactions during the year with the insurance department of that State, it must

1. Fire insurance companies generally must apply to the insurance department of each state for permission to engage in the insurance business in that state. If the company meets the requirement of the insurance department, it will be "admitted" to do business in that state. Although some states have more stringent requirements than others, there is a considerable degree of reciprocity between the states, and usually when an insurance company registers to do business, files financial statements, and qualifies in one state, it will be treated as an "admitted company" in other states. On the other hand, there are foreign underwriters and agents who never register to do business in any one of the states, do not file financial statements or other reports with the insurance department of any state. Such insurance companies, even though their financial condition and business is highly favorable, are classed as "non-admitted companies".

2. The figure for 1942 was actually $132,-502.27. For the purpose of simplification and avoiding an extended explanation, $1,863.23 has been added to it.

Because of the war and currency restrictions, the amounts recoverable from the English underwriters or their agents represented frozen assets, the collection of which was dependent on future developments. Reserve funds for such payments could not have been easily liquidated until after a long lapse of time.

3. Other states which require insurance companies, such as the taxpayer in the instant case, to maintain reserve funds for reinsurance placed with non-admitted companies are as follows: Alabama, Colorado, Illinois, Indiana, Iowa, Maryland, Massachusetts, Nebraska, New Hampshire, New York, Ohio and West Virginia. And to a limited extent, Tennessee and Washington.

show the reserves mentioned in paragraph No. 3 above.[4]

5. In making its annual statement to the Insurance Department of Pennsylvania and other states for the years 1941 through 1944, the taxpayer allegedly followed the annual statement blank approved by the National Convention of Insurance Commissioners. This thirty-one page model blank, known as the Convention Form, is a uniform classification of accounts peculiar to insurance companies subject to § 204 of the Internal Revenue Code. It also contains two recapitulation charts, three exhibits, and a number of general interrogatories and schedules requesting information concerning the company's assets and business transactions. Pages 2 and 3 of the Convention Form reflect all cash receipts and disbursements during the year of the report and represents the cash part of the accounting system. Pages 4 and 5 represent the balance sheet and show the accrual of all items at the year's end. The Underwriting Exhibit on page 10, and the Miscellaneous Exhibit on page 11 are in effect a reflection or summary of both the prior cash and accrual items.

(a) Under the heading of "Income" on page 2 of each of the four annual statements, the amount of the premiums *written* in policies by the taxpayer during the year was reduced by the sum of premiums *paid* for reinsurance both for admitted and non-admitted companies. The several columns of item 17 respectively reflected the totals of those two amounts and also the net amount of premiums *retained* by the taxpayer. Item 18 showed the gross amount of deposit premiums *written* on perpetual risks.[5]

(b) On page 3, under the heading "Disbursements", gross losses *paid* were reduced by amounts *recovered* on salvage and reinsurance from both admitted and non-admitted companies. The several columns of item 14 respectively reflected the totals of those two amounts and also the net losses *paid* after such deduction. The amount of deposit premiums *returned* on perpetual risks was shown as item 31 of the same page.

(c) At item 12 and "item 12A" on page 4, on which Ledger Assets were set forth, the amount of reinsurance *recoverable* from both admitted and non-admitted companies on *paid* losses was shown. "Item 12A" was an added item; that is, one that was printed in by the taxpayer to show a breakdown of the above amount between non-marine and marine risks.

(d) On page 5, under the heading "Liabilities", gross *unpaid* losses incurred were reduced by amounts *recoverable* on reinsurance from both admitted and non-admitted companies. The several columns of item 15 respectively reflected the totals of those two amounts and also the net *unpaid* losses after such deduction. Also listed at item 18 was the total gross premiums, less reinsurance *received* and *recoverable* from both admitted and non-admitted companies upon all unexpired risks; and, at item 19, amounts *reclaimable* by the insured on perpetual fire insurance policies. Although there was no such item, the taxpayer caused to be printed on this page "item 32B" in order to show the following sums *recoverable* from non-admitted companies: (a) the amount (of its reserve) for reinsurance on *paid* losses, and (b) the amount (of its reserve) for reinsurance on *unpaid* losses. The effect of showing the latter sum was to add back that figure after it had been previously deducted at item 14. The obvious purpose of the entire "Item" was to increase the total amount of liabilities by the amount shown. Item 33 reflect-

4. For accounting purposes, the effect of showing these reserves is to prevent the amounts which they represent from being respectively reflected as an increase in income and as a deduction from losses until they become cash transactions.

5. In the recapitulation charts on page 7 of the annual statements, the unearned premium reserve at the beginning and end of each year was reduced by the amount of reinsurance ceded to admitted companies, but was not reduced on account of insurance placed with non-admitted companies. However, amounts appearing on that page did not enter into the computations made in the Underwriting Exhibit on page 10 of the annual statements.

ed the total of items 1 to "item 32B" inclusive on that page.

(e) On page 10, under the heading "Underwriting Exhibit", the total amount of both the premiums *earned* and the losses *incurred* during the year were computed. These computations took into account the items set forth in paragraphs 3 (a, b, c and d) above. In arriving at the amount of premiums *earned* during the year, shown as item 5, the taxpayer treated reinsurance with admitted and non-admitted companies alike, and reached the same figure which would be obtained if it followed the computation set forth in § 204 (b)(5) of the Code. Item 14 reflected the total losses incurred during the year. This sum did not include any portion of the amounts appearing at "item 32B" on page 5 of the annual statement, and it equaled the amount which would be obtained if the computation directed by § 204 (b)(6) of the Code were followed.

(f) On page 11, under the heading "Miscellaneous Exhibit", the taxpayer caused to be printed "item 70B" so that the increase over the previous year in the amount of reinsurance on paid and unpaid losses *recoverable* from non-admitted companies could be shown. The effect of this item was to increase the loss in surplus by that amount. For the three taxable years involved the following amounts were reflected after that "item": 1942, $61,448.88 ($59,585.67 plus $1,863.21); 1943, $110,296.33 ($112,159.54 minus $1,863.21); and 1944, $49,527.28.

6. Its books were kept and its income tax returns were reported on the accrual basis of accounting. Its fiscal and tax year was the calendar year.

7. Concerning ourselves with underwriting transactions only, the taxpayer, in filing its income tax returns for the years involved, reported the net amount of earned premiums as shown at item 5 of the Underwriting Exhibit on page 10 of the annual statements. The sum appearing under other deductions authorized by law (item 29, page 1 of the income tax return) includes the amount of losses incurred during the year as shown at item 14 of the Underwriting Exhibit. Amounts shown at "item 32B", page 5, and "item 70B", page 11 of the annual statements were reflected as surplus adjustments under Schedule M. (Reconciliation of Net Income and Analysis of Earned Surplus.......) of the income tax returns, clearly demonstrating that such amounts were not used by the taxpayer in determining its taxable income.

8. Following the decision in the case of Commissioner of Internal Revenue v. New Hampshire Fire Insurance Company, 1943, 2 T.C. 708, affirmed in 1 Cir., 1945, 146 F.2d 697, the taxpayer filed timely claims for refunds for the years 1942, 1943 and 1944 with the Collector of Internal Revenue for the First District of Pennsylvania. The alleged basis for the claims is that the taxpayer in determining its tax liability should have included in its deductions (or what amounts to the same thing, increased its losses) the sums, representing reserve funds, recoverable from non-admitted companies for reinsurance on paid and unpaid losses and thus have reduced its taxable income for each of the three years by the amount of the yearly increase of such sums. The Commissioner of Internal Revenue, maintaining that the taxpayer had correctly computed its income tax in the first instance, disallowed the claims.

9. On March 23, 1950, the taxpayer brought the two actions here involved.

### Discussion.

Subsection (b) of § 204 [6] of the Internal Revenue Code, 26 U.S.C.A. § 204(b), sets forth the definition of terms used in the determination of income of companies subject to the Code. For the purpose of computing net income, subsection (c), of which only subsection 4 thereof is pertinent here, lists the deductions allowed from gross income. These subsections do not specifically provide for an exclusion from gross income, or the inclusion in allowable deductions, the amount of the increase over

---

6. This section is unusual in that it permits, to the extent set forth therein, a taxpayer subject to the Code to use a combination of cash and accrued items in determining its taxable income.

the previous year in a reserve for losses recoverable on reinsurance placed with non-admitted companies. But because § 204(b)(1) defines gross income as the "gross amount earned during the taxable year * * * from underwriting income as provided in this subsection, computed on the basis of the underwriting * * * exhibit of the annual statement approved by the National Convention of Insurance Commissioners", the taxpayer contends that if amounts, such as "item 32B", appearing in its annual statements to the insurance departments of the states increase the liabilities, then such amounts should be taken into consideration in computing its taxable income. That is, if the Convention Form, which it claims to have followed, treats risks reinsured with non-admitted companies as business retained for the purpose of determining losses, it should have been permitted to observe such treatment in computing its losses incurred for income tax purposes, thereby reducing its taxable income by the amount of losses recoverable on reinsurance placed with non-admitted companies. Opposing this contention the defendants maintain that the taxpayer did and should in computing losses, subtract therefrom amounts recoverable from all reinsurance companies even though such companies include non-admitted ones; and this is so regardless of the laws and regulations of the states in which the taxpayer transacted business. In short, they maintain that underwriting income must be computed in accordance with the specific provision of § 204 of the Code and that the Convention Form is to be taken as a general guide only.

The issue posed here has been raised in other actions in which the respective contentions of the parties have a familiar ring. This court is in accord with decisions reached in Pacific Employers Ins. Co. v. C. I. R., 9 Cir., 1937, 89 F.2d 186, and C. I. R. v. General Reinsurance Corp., 2 Cir., 1951, 190 F.2d 148. In addition our Circuit Court has consistently held that amounts representing reserve funds required by state law are not to be considered in determining taxable income of insurance companies. See American Title Co. v. C. I. R., 3 Cir., 1935, 76 F.2d 332; Wayne Title and Trust Company v. C. I. R., 3 Cir., 1951, 195 F.2d 401.

But even if the above cases are wrong in their interpretation of § 204, the taxpayer, it would seem to us, still could not prevail in the actions here involved. In our opinion, the taxpayer did not completely follow the Convention Form item for item in filing its annual statements with the Pennsylvania Insurance Department; it followed that Form with certain modifications. These modifications were made by the taxpayer to show, as required by Pennsylvania law or regulations of the Insurance Department of that State, the amount of certain reserve funds for losses concerning transactions with non-admitted companies. The purpose for which the reserve funds were required to be reported could have been accomplished by either of two ways by the taxpayer. One, by ignoring transactions with non-admitted companies when reducing gross unpaid claims under the heading "Liabilities" on page 5 of the annual statements. The other, by taking such transactions into consideration and then offsetting them in whole or in part by other sums equal in amount to the required reserve funds. The taxpayer chose the latter way. We think the following of either of the above methods by an insurance company subject to § 204 would be a modification of the Convention Form.

When it was preparing the Convention Form, the Convention of Insurance Commissioners [7] was aware of the fact that the laws of a few states maintained, with respect to reserve funds, a distinction between reinsurance with admitted companies on the one hand and that ceded to non-admitted companies on the other. It was impossible for the Convention to provide a form which would completely satisfy the insurance departments of every state. The

7. The Convention of Insurance Commissioners is not a legislative body, but a recognized voluntary group organized for the purpose of streamlining and making uniform the reporting of annual statements of insurance companies. Its proposals need not be, but usually are, followed by the individual states.

Convention did the next best thing: It drew up a form containing only those items of accounts upon which there was no disagreement among the individual states. This is the form to which the Code apparently refers. However, the Convention left a number of blank spaces in the form for the insertion of items, required to be shown by certain states, in that area in which uniformity among all the states is lacking. But whenever an item in that area is added by an insurance company subject to the Code it is not such an item as is required by the Convention Form. This is especially so when the effect of the added item is to neutralize or nullify in whole or in part entries or computations required by the Form.

Under the heading, "Income", on page 2, item 17, of the Convention Form, the companies are required to show their net premiums written on policies during the year. To obtain this figure, the company must deduct all premiums ceded to reinsurance companies. There can be no question that when the term "reinsurance" is used on this page it means reinsurance placed with all companies—both admitted and non-admitted. The insurance departments of the various states do not and would not permit a different treatment by the companies. When cash is paid out it is just as much gone from the assets of the company if it is paid to a non-admitted company as when it is paid to an admitted company. There is nothing in the Convention Form to indicate that when the word, "reinsurance", appears on subsequent pages something less than all reinsurance is meant. The Form contains no items whereby transactions with admitted and non-admitted companies may be distinguished; any showing of such a distinction must be made by a schedule or added explanation, such as a footnote, sub-total or added item. Hence the instruction, "Deduct reinsurance", appearing in column 5 on page 5 of the Convention Form means deduct all reinsurance. Such an interpretation does not conflict with § 204 (b)(1) of the Code, and if followed would assist in both uniformity of reporting in the annual statements and arriving at the companies' true income.

It would seem, therefore, that "item 32B" added by the taxpayer in its annual statements is not an item required by the Convention Form. That amount of the "item" appearing as unpaid losses recoverable from non-admitted companies nullifies in part a subtraction previously made on the same page; that part of the "item" appearing as reinsurance on paid losses recoverable from non-admitted companies is inappropriate, from an accounting viewpoint, for increasing the liabilities if the scheme of the Convention Form is followed. That sum has already been included in the total of item 12 and "item 12A" under Ledger Assets on page 4 of the annual statements.[8]

### Conclusions of Law.

1. This court has jurisdiction over the parties and the subject matter of the actions here involved.[9]

2. The specific provisions of § 204 of the Internal Revenue Code, 26 U.S.C.A. § 204, are to be followed by the taxpayer in computing its underwriting income for income tax purposes, and the Convention Form is to be used as a general guide.

3. The term "reinsurance" appearing in the Convention Form means all re-

---

8. Effective with the year 1950, the National Convention of Insurance Commissioners revised the Convention Form thereby removing any doubt as to whether reinsurance with non-admitted companies is to be reflected in income in the same manner as reinsurance with admitted companies. The Bureau of Internal Revenue has noted with approval the effect of the change in the Convention Form in Mim. R. A. No. 1819, reported in

5 Fed. Tax Reports (C.C.H. 1951) § 6090. The amendment to the Form makes academic the issue raised in these actions for 1950 and subsequent years.

For a discussion of the situation leading up to the change, see the article by Charles W. Tye in 6 Tax Law Rev. 245 (1951).

9. Jurisdiction of this court over the subject matter is based on 28 U.S.C.A. §§ 1340, 1346(a) (1).

insurance, including transactions with non-admitted companies as well as with admitted ones.

■ 4. The taxpayer, in ascertaining its losses for the taxable years involved, properly subtracted from such sums the amounts recoverable from reinsurance companies, both admitted and non-admitted. For income tax purposes, it may not treat insurance risks reinsured with non-admitted companies as business retained by it.

■ 5. The taxpayer was not entitled to have included in its allowable deductions for income tax purposes the increase over the previous year in its reserve for losses recoverable on reinsurance placed by it with non-admitted companies.

6. The amounts sought to be recovered in these actions have not been erroneously collected by the Collector of Internal Revenue for the First District of Pennsylvania; and the taxpayer is not entitled to recover such amounts.

Accordingly, the defendants are entitled to judgment against the plaintiff.