## FIRE ASS'N OF PHILADELPHIA v. U. S.

## FIRE ASS'N OF PHILADELPHIA v. SMITH.

### Nos. 10967, 10968.

United States Court of Appeals Third Circuit.

Argued Sept. 15, 1953.

Decided Oct. 29, 1953.

Clement J. Clarke, Jr., Philadelphia, Pa. (Richard C. Sorlien, Frederick H. Spotts, Pepper, Bodine, Stokes & Hamilton, Philadelphia, Pa., on the brief), for appellant.

Harry Marselli, Sp. Asst. to Atty. Gen., Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Leland T. Atherton, Sp. Assts. to Atty. Gen., Washington, D. C., Joseph G. Hildenberger, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

In these suits a Pennsylvania insurance company, Fire Association of Philadelphia, is seeking refunds of alleged overpayments of income taxes for the years 1942, 1943 and 1944. The district court concluded that there had been no overpayments and the taxpayer has appealed.

The basis of the claim is the same for each year. The matter in controversy is the proper treatment of certain reinsurance transactions for tax purposes. The taxpayer had ceded excess cover on large marine risks to companies not authorized to do business in Pennsylvania. When, during the taxable year, losses occurred that were thus covered, Pennsylvania required the taxpayer to establish reserves in the full amount of its own obligation to the insured despite the fact that in normal accounting and practical effect its actual loss would be reduced by the amount recoverable by it on reinsurance.

In these circumstances, the taxpayer, in computing its gross income in its income tax return on the accrual basis, reduced its deductible losses by the amounts accrued and payable to it, but

not yet collected, from unauthorized companies on reinsurance. After paying its tax calculated on this basis the taxpayer decided that it should have cancelled out this reduction in losses by claiming as an additional loss or expenditure the amount it had added to its reserve during the year as required by law to cover so much of its losses as were offset by reinsurance placed with but yet to be collected from unauthorized companies. It is clear that ordinarily in the computation of taxable income such a reserve would not be a permissible deduction. Cf. American Title Co. v. Commissioner, 3 Cir., 1935, 76 F.2d 332; Wayne Title and Trust Co. v. Commissioner, 3 Cir., 1952, 195 F.2d 401. If such a deduction is allowable here it must be by reason of special provisions of Section 204(b) of the Internal Revenue Code, 26 U.S.C. § 204(b), concerning the determination of taxable income of such insurance companies as the taxpayer. The parties seem to agree on this overall view of what the problem is.

Section 204(b) of the Internal Revenue Code defines gross income in a case of this kind as including the "gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, *computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners * * *.*" (Italics added.) The phrase "underwriting income" as used in the foregoing provision is defined in subsection 204(b) (4) as "premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred". And "losses incurred" are in turn identified in subsection 204(b) (6) as "losses incurred during the taxable year on insurance contracts".

During the period in controversy the "underwriting and investment exhibit", designated in Section 204(b) as the basis of the computation of gross income, constituted two pages with some 80 entries in a 30 page standard form prescribed by the National Convention of Insurance Commissioners for the use of stock fire and marine insurance companies in making their annual reports to state insurance departments. The several state insurance commissioners are members of the Convention and the Convention Committee on Form works out and, from time to time, revises the subject matter and organization of the required annual statement.

The underwriting and investment exhibit is composed of three sections respectively entitled "underwriting exhibit", "investment exhibit", and "miscellaneous exhibit". The underwriting exhibit contains computations of "premiums earned during the year", "losses incurred during the year" and "underwriting expenses". For present purposes, analysis of the investment exhibit is unnecessary. However, the calculations in these two sections are combined to yield a single figure, item 62, which is the gain in surplus which has resulted from the year's underwriting and investment activities. The final section of this part of the annual statement called "miscellaneous exhibit" appears to be a balancing and reconciling computation. Specifically, it is a summary listing and aggregation of dividends declared during the year, increases and decreases of reserves, and a balancing figure called "increase in surplus", all of which in sum equal the "gain in surplus" already computed in the preceding sections on the basis of the year's actual underwriting and investment activities.

In its original income tax returns, the taxpayer apparently tried to use the above-described underwriting and investment exhibit as authorized by Section 204(b) in the computation of its "gross income * * * earned during the taxable year * * * from underwriting income * * *." It reported the exact computation of "premiums earned during the year" which appeared in the underwriting and investment exhibit and was totalled in item 5 of that exhibit. It deducted "losses incurred during the year", again exactly as stated in item 14 of the exhibit. It reported "underwriting expenses" as shown in this ex-

hibit. This conformity between the original income tax calculation and the underwriting and investment exhibit has been expressly found as a fact by the district court and there seems to be no question about it on this appeal. We state the matter this way because this case was tried on a stipulation of facts and the record does not contain the income tax returns in detail as filed.

On the other hand, the year's changes in reserves covering reinsurance with unauthorized companies were, in the words of the district court's findings, "reflected as surplus adjustments under Schedule M. (Reconciliation of Net Income and Analysis of Earned Surplus * * *) of the [taxpayer's original] income tax returns, clearly demonstrating that such amounts were not used by the taxpayer in determining its taxable income." [110 F.Supp. 868].

The taxpayer now says that this treatment of the reserve was a mistake; that the year's additions to the reserve should have been treated as an additional loss or expense item, reducing its gross income, in a proper computation in accordance with Section 204(b). It is to accomplish that change that the present claim is made.

The taxpayer's present position can be correct only if the underwriting and investment exhibit itself treats the reserve in question as a loss or expense, for the taxpayer's essential premise is that its original filing erroneously departed from the underwriting and investment exhibit of its annual statement. However, it seems to us that it is the taxpayer's present claim, rather than its original return, which varies the relevant premium and loss entries and computations as it had set them out in its underwriting and investment exhibit.

It is true that there is an additional fact, much emphasized by the taxpayer, that in an altogether different portion of its annual statement the reserve in question is set up as a "liability". But we think this fact is not pertinent to the present controversy. The taxpayer is insisting that so long as its computation of taxable income accurately reflects a section of its annual report as specified in Section 204(b) it must be accepted as correct. But in taking this position the taxpayer itself must respect the precise language of the statute which authorizes the computation of gross income on the basis of the underwriting and investment exhibit and not on the basis of anything else which may quite properly appear in any other portion of the annual statement.

The only reference to the reinsurance reserve which appears in the taxpayer's underwriting and investment exhibit is the already-mentioned reconciling statement incorporated as a miscellaneous exhibit. When the taxpayer in his original return merely took cognizance of what appeared in this miscellaneous exhibit as "surplus adjustments" rather than as an accounting in terms of income, loss or expense we think it did not distort the underwriting and investment exhibit. Indeed, we think that exhibit was respected and followed. It does not help taxpayer that the Convention approved accounting in the underwriting and investment exhibit merely states the amount of the reinsurance reserve and recognizes it as necessary and proper, so long as the calculation of premium income, losses and underwriting expenses in the exhibit does not take this item into account as a loss or an expense.

In this court and in the district court both the taxpayer and the government have argued at length the question whether we should follow the rule, which they derive from C. I. R. v. New Hampshire Fire Ins. Co., 1 Cir., 1945, 146 F. 2d 697, affirming 2 T.C. 708, that Section 204(b) prevents the government from requiring for income tax purposes any modification of the computation of gross income which appears in the underwriting and investment exhibit of the regularly filed and approved convention form annual statement. However, we do not reach this issue because we think the taxpayer, while arguing for the rule of the New Hampshire case, presents a factual situation in which the New Hampshire rule would defeat its claim. Although this conclusion follows from

what we already have said, it may be made clearer by contrasting the present facts with those in the New Hampshire case.

We have not examined either the income tax return or the underwriting and investment exhibit involved in the New Hampshire case. However, the Tax Court decision in that case makes this statement concerning the taxpayer's transactions with unauthorized companies: "Such transactions do not enter into its income as set forth on the convention form and are not permitted to be included in any of the calculations there appearing." 2 T.C. at page 722. Similarly, the Court of Appeals said that the taxpayer "used the exact figures appearing in the underwriting and investment exhibit * * * in computing its gross underwriting income for those years. The Commissioner's position is that the taxpayer ought not to have used those figures as they stood but instead should have made certain adjustments in them." 146 F.2d at page 698. Thus it appears that the taxpayer with Convention sanction, simply ignored its business with unauthorized companies when it computed gain and loss in its underwriting and investment exhibit.

We are the more confident that this is the correct view of the situation the courts were contemplating in that case because of a separate matter which was involved there and discussed in the opinion of the Tax Court. The taxpayer had written certain insurance in the interest of a large group of companies associated as the Factory Insurance Association, or "F. I. A." The F. I. A. business, apparently unlike business with unauthorized companies, had been included in arriving at the premium income and loss figures set out in the underwriting exhibit. But believing that it was not properly chargeable with this business for income tax purposes, the taxpayer in its income tax return modified the underwriting exhibit figures to eliminate the F. I. A. business. The Tax Court pointed out in this connection that "the petitioner did not carry the amount shown as item 5 on page 10 of the annual statement [the earned premium item of the underwriting exhibit] * * * to [the corresponding] * * * item in its income tax return * * *." Similarly, "the petitioner did not carry the total of the amounts shown as items 14 and 19 on page 10 of the annual statement [losses incurred and loss adjustment expenses as stated in the underwriting exhibit] * * * to [the corresponding] item * * * of its income tax return". See 2 T.C. at page 713. The Tax Court then proceeded to say that this modification of the relevant computation of gross income in the underwriting and investment exhibit was inconsistent with the requirement of Section 204(b).

When this ruling and the ruling made in the same opinion on the reinsurance items are considered together, we think the purport of the New Hampshire case is clear. The courts were saying there that it is not permissible to do the very thing which the taxpayer seeks to do here in mistaken reliance upon the doctrine of the New Hampshire case.

Finally, there is a further reason for avoiding any expression of opinion on the merits of the doctrine of the New Hampshire case. The Convention form of annual statement was revised in 1950 so that in the future any extraordinary treatment or elimination of transactions related to unauthorized insurance in compliance with special requirements of certain states would not appear or be reflected in any way in the underwriting and investment exhibit, but would be stated separately and in such fashion as to appear unmistakably as a surplus adjustment and not an income adjustment. See 5 C.C.H.1951, Fed.Tax Rep. § 6090. Tye, The Convention Form and Insurance Company Tax Returns, (1951) 6 Tax L.Rev. 245, 251–2. Thus, the underwriting and investment exhibit can no longer be used in justification of such tax treatment of reinsurance transactions as the Commissioner challenged in the New Hampshire case and in the present case.

The judgments will be affirmed.