FIRST NATIONAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60487. Filed June 30, 1959.

*William Waller, Esq.*, for the petitioner.
*George L. Hudspeth, Esq.*, for the respondent.

WITHEY, *Judge:* Deficiencies in income tax for the taxable years 1951, 1952, and 1953 have been determined by the Commissioner against petitioner in the respective amounts of $42,381.19, $5,742.79,

and $6,597.97. The only question presented for determination is whether respondent erred in disallowing deductions taken as interest upon a demand promissory note issued by petitioner to a tax exempt organization. All other issues raised by the pleadings have been disposed of by stipulation of the parties. The taxable year 1954 also is involved because of a net operating loss for which petitioner has claimed a carryback.

### FINDINGS OF FACT.

All facts which have been stipulated are found accordingly.

The petitioner is a Tennessee corporation having its principal place of business at Nashville, Tennessee.

The petitioner filed its Federal corporation income tax returns for all years here involved, 1951 to 1954, inclusive, with the collector or director of internal revenue, Nashville, Tennessee.

The petitioner is engaged in the mercantile business. It was originally organized as a bank and trust company in 1926 but on January 28, 1943, its charter was amended changing its name to that which it presently bears and on June 7, 1944, its corporate purposes and powers were changed by further amendment to its charter to those of a mercantile establishment. Its original authorized capital stock consisted of 1,000 shares of voting common stock of a par value of $100 per share. By amendment to its charter of incorporation on May 29, 1926, its name was changed from First National Company to Fourth and First National Company. Except for being involved in certain litigation, both as a plaintiff and as a defendant, the petitioner was not engaged in any active business from late in 1931 to early in 1943.

During the years 1930 and 1931 the petitioner issued promissory notes as follows:

| Date of issue | Date payable | Payee | Original amount |
|---|---|---|---|
| Sept. 8, 1930 | 3 months from date of issue | National City Bank of New York. | $500,000 |
| Oct. 9, 1930 | Feb. 9, 1931 | Philadelphia National Bank | 250,000 |
| Oct. 23, 1930 | 90 days from date of issue | Riggs National Bank of Washington, D.C. | 200,000 |
| Jan. 23, 1931 | On demand | American National Bank, Nashville, Tenn. | 650,421 |
| Jan. 23, 1931 | On demand | Nashville Trust Co., Nashville, Tenn. | 323,930 |
| Jan. 23, 1931 | On demand | Fourth & First Banks, Inc. | 324,570 |
| Jan. 23, 1931 | On demand | Fourth & First Banks, Inc. | 351,329 |
| Nov. 16, 1930 | On demand | Fourth & First Banks, Inc. | 13,000 |
| Total | | | 2,613,250 |

In April 1931, Fourth & First Banks, Inc., hereinafter called Fourth Banks, recorded on its books an account entitled "Claim against Fourth & First National Company on account of settling Employees

Subscriptions." Charges to this account were made by the Fourth Banks on April 8, 1931, and April 10, 1931, in the respective amounts of $73,228.66 and $1,318.50, for a total of $74,547.16. Both entries were described as being "Checks to Employees for 75% of total claims." No entry for this account was made on the petitioner's books until January 31, 1937.

All the foregoing notes were issued for borrowed money. The two notes payable to Fourth Banks for $324,570 and $351,329 were unsecured. The remainder of the notes were secured by collateral.

By December 1942, there had been various payments made on part of these notes, mostly through sales of collateral by the respective holders. However, there had been no payments on the notes held by the Fourth Banks in the amounts of $324,570 and $351,329.

Prior to December 1942 the entire authorized and outstanding capital stock of petitioner, consisting of 1,000 shares of voting common stock of a par value of $100 per share, or a total value of $100,000, was owned by Fourth Banks. Sometime prior to December 31, 1940, the Fourth Banks had written off on its books of account and records its investment in the stock of petitioner to a value of $1.

On December 11, 1942, for a consideration of $1,000, Parkes Armistead, hereinafter called Armistead, Paul M. Davis, hereinafter called Davis, and G. L. Comer, sometimes hereinafter called Comer, acquired the total outstanding capital stock of petitioner from Fourth Banks, together with notes payable and account payable of petitioner to the Fourth Banks having unpaid balances totaling $761,140.66. The Fourth Banks dealt exclusively with Armistead in this sale, which sale had been authorized by its board of directors on November 20, 1942.

These 1,000 shares of stock were officially transferred on the stock certificate books of petitioner on January 4, 1943, to the following: Armistead, 333 shares; Davis, 332 shares; Comer, 332 shares; Carmack Armistead, 1 share; D. L. Lansden, 1 share; and Paul M. Davis, Jr., 1 share.

The $761,140.66 claimed to be due from petitioner to Fourth Banks as of December 1942 was composed of the following:

| Form of indebtedness | Payable to— | Original amount | Unpaid balance Dec. 1942 |
|---|---|---|---|
| Note payable | Fourth Banks | $13,000.00 | $5,444.50 |
| Note payable | Fourth Banks | 351,329.00 | 351,329.00 |
| Note payable | Fourth Banks | 324,570.00 | 324,570.00 |
| Note payable | Riggs National Bank of Washington, D.C., endorsed *without recourse* to Fourth Banks on Jan. 27, 1934, with balance due thereon of $5,250. | 200,000.00 | 5,250.00 |
| | Total notes | | 686,593.50 |
| Account payable | Fourth Banks | 74,547.16 | 74,547.16 |
| | Grand total | | 761,140.66 |

The aforesaid $761,140.66 had, sometime prior to December 31, 1940, been written off on the books of account and records of Fourth Banks to a value of only $2.

The account payable of $74,547.16 represented the claim against petitioner in the same amount heretofore mentioned which had been recorded on the books of Fourth Banks in April 1931.

Petitioner's $13,000 note payable to Fourth Banks had been reduced to $5,444.50 in unpaid principal amount through compromises on January 22, 1936, and October 23, 1936, of the notes attached thereto as collateral. No other payments were ever made thereon.

Petitioner's $200,000 note payable to Riggs National Bank had been reduced in principal amount to $5,250 when it was endorsed without recourse to Fourth Banks on January 27, 1934. No further payments were ever made on it.

In December 1942, the unpaid balance on petitioner's promissory notes to National City Bank of New York, hereinafter called National Bank, Philadelphia National Bank, hereinafter called Philadelphia Bank, American National Bank, hereinafter called American Bank, and Nashville Trust Company, hereinafter called Nashville Trust, was $1,127,900.11. This balance is computed as follows:

| Payee | Original amount of note | Payments | Unpaid balance Dec. 1942 |
|---|---|---|---|
| National Bank | $500,000 | $110,473.74 | $389,526.26 |
| Philadelphia Bank | 250,000 | 27,641.48 | 222,358.52 |
| American Bank | 650,421 | 206,299.31 | 444,121.69 |
| Nashville Trust | 323,930 | 252,036.36 | 71,893.64 |
| Total | 1,724,351 | 596,450.89 | 1,127,900.11 |

By 1934 the National Bank had charged off as worthless $425,000 of the principal of the note due it from petitioner. Philadelphia Bank had by June 30, 1932, charged off to profit and loss $222,829.30 of the principal of the note due it from petitioner. The American Bank by April 15, 1933, had charged off to profit and loss $432,529.60 of the principal of the note due it from petitioner, and Nashville Trust by November 23, 1932, had charged off to profit and loss $72,081.83 of the principal of the note due it from petitioner.

With minor exceptions, the total payments or collections on the notes payable to National Bank, American Bank, and Nashville Trust arose solely from sales of or proceeds from collateral held by those banks as security for the notes.

With respect to the note payable to Philadelphia Bank, all payments credited thereon likewise arose from the sale of collateral securities.

Prior to December 11, 1942, the date Armistead, Davis, and Comer acquired the stock of petitioner from Fourth Banks, Arimstead had

obtained commitments from National Bank, Philadelphia Bank, American Bank, and Nashville Trust that each would transfer to him the notes of petitioner for 4½ per cent of the unpaid balance of each note.

Also, prior to the time Armistead, Davis, and Comer acquired the stock of petitioner from Fourth Banks, the board of directors of the latter had, by resolution dated August 14, 1942, subordinated its claims against petitioner, totaling $761,140.66, to the claims of National Bank, Philadelphia Bank, American Bank, and Nashville Trust. This resolution recognized that Fourth Banks would have grave difficulty in establishing a large portion of its claims against the petitioner on a pro rata basis with the other four banks and that the subordination of its claims against petitioner would result in its getting nothing in a distribution of petitioner's assets. The action of the directors of Fourth Banks in adopting the resolution of subordination was obtained through the efforts of Armistead who was executive vice president of American Bank and a director of petitioner.

On December 10, 1942, the American Bank had executed a release, releasing the Fourth Banks from any possible contingent liability arising from the note of petitioner payable to the American Bank. Releases of identical nature were also executed on behalf of National Bank, Philadelphia Bank, and Nashville Trust on December 8, 1942, December 9, 1942, and December 10, 1942, respectively.

In mid-December 1942, the National Bank, Philadelphia Bank, American Bank, and Nashville Trust transferred their respective notes of petitioner to Armistead for amounts which were equivalent to 4½ per cent of the unpaid balances of the principal thereof as reflected on the books of petitioner.

Armistead made payments, by personal checks or cashier checks purchased for that purpose, to the aforesaid four banks for each of the notes involved in the sums indicated. These payments were as follows:

| Payee | Date of payment | Amount |
|---|---|---|
| National Bank | Dec. 15, 1942 | $17,528.68 |
| Philadelphia Bank | Dec. 15, 1942 | 10,006.13 |
| American Bank | Dec. 28, 1942 | 19,971.65 |
| Nashville Trust | Dec. 14, 1942 | 3,235.21 |
| Total | | 50,741.67 |

The negotiations for the acquisition of petitioner's stock, for obtaining all the old notes and obligations of petitioner payable to Fourth Banks, and for obtaining the petitioner's notes payable to National Bank, Philadelphia Bank, American Bank, and Nashville Trust were made by Armistead and Davis. The unsold collateral that had been pledged to secure these notes was surrendered to Armistead. This unsold collateral was then and has remained worthless.

The value of petitioner's total assets was $51,531.20 at this time, $35,147.40 of which was actually cash. The assets other than cash were immediately converted into cash, and the $50,741.67 that Armistead had paid out in obtaining the notes from National Bank, Philadelphia Bank, American Bank, and Nashville Trust was repaid to him almost simultaneously by the petitioner. Armistead was repaid as follows:

| With respect to note originally payable to | Date of payment | | Total amount |
|---|---|---|---|
| National Bank | Dec. 15, 1942 | | $17,528.68 |
| Philadelphia Bank | Dec. 15, 1942 | | 10,006.13 |
| American Bank | Dec. 28, 1942 | $12,971.65 | |
| | Jan. 13, 1943 | 7,000.00 | |
| | | | 19,971.65 |
| Nashville Trust | Dec. 15, 1942 | | 3,235.21 |
| Total | | | 50,741.67 |

The excess cash derived from the liquidation of petitioner's assets was expended in its entirety in defraying the cost of liquidation and in the purchase of transfer stamps for the transfer of its stock on its books to Armistead, Davis, and Comer.

In mid-December 1942, Armistead was, and had been since February 1937, a member of the board of directors of petitioner and he continued to be such a member until June 22, 1943. He was also executive vice president of the American National Bank, a holder of one of the large notes due from petitioner. He was made president of the petitioner on December 15, 1942, and continued in such capacity until July 15, 1943.

Davis was, in mid-December 1942, the president of the American National Bank. He was made a member of the board of directors of petitioner on December 15, 1942, and remained such a member until June 22, 1943. He was also the vice president of petitioner from December 15, 1942, to July 15, 1943.

Comer was elected a member of the board of directors of petitioner on June 22, 1943, and has remained such a member to the present time. He was also elected as one of the three vice presidents of petitioner on July 15, 1943, and has continued in such capacity to the present date.

On January 28, 1943, petitioner amended its charter of incorporation changing its name from Fourth and First National Company to First National Company, and—

to reduce the capital stock from $100,000.00 to $5000.00, to be divided into 5000 shares of a par value of $1.00 each, and so as to provide that the present stock of the corporation, consisting of 1000 shares of a par value of $100.00 per share, shall be exchanged for 1000 shares of said new stock of a par value of $1.00 per share, and the remaining 4000 shares of new stock shall be available for issuance as provided by law; * * *

On July 1, 1943, petitioner issued its unsecured, demand promissory note to Davis, Armistead, and Comer in the amount of $74,547.16. This note was issued in lieu of the account payable in a like amount that petitioner had carried on its books as being due Fourth Banks. Petitioner's minute books contain no authorization for issuance of this note.

On or about January 12, 1945, Comer purchased the respective interests of Armistead and Davis in petitioner for $30,000 to each of them, or an aggregate of $60,000. The 3 shares of petitioner's stock as issued to Carmack Armistead, D. L. Lansden, and Paul M. Davis, Jr., on January 4, 1943, had been endorsed subsequent to that date to the order of Comer, and a new certificate for 1,000 shares of common stock was then issued to Comer by petitioner on January 12, 1945. On such date he was the sole owner of petitioner's outstanding voting common stock, and his total investment therein was $60,333.

On May 15, 1946, petitioner again amended its charter of incorporation. This amendment authorized the issuance of 10,000 shares of preferred stock without nominal or par value.

On May 31, 1946, Comer, for the sum of $60,333, transferred the total 1,000 shares of outstanding voting stock of petitioner to Washington Manufacturing Company. Comer has been the president and director of this company from 1946 to the present time. M. B. Comer, a brother to the G. L. Comer here concerned, was vice president and a member of the board of directors of that company from January 12, 1946, until his death on June 26, 1953. The majority and controlling interest of the voting stock of Washington Manufacturing Company was, on May 31, 1946, and still is, owned by R. W. Comer & Sons Trust. Comer is the trustee of this trust, but he is not a beneficiary thereof. He was also one of the grantors of the trust, the other two grantors being R. W. Comer and M. B. Comer.

On October 26, 1946, Washington Manufacturing Company transferred the total 1,000 shares of the outstanding voting stock of petitioner to Washington Overall Manufacturing Company. The majority and controlling interest of the voting stock of that company was then, and still is, owned by the R. W. Comer & Sons Trust. Comer has been vice president and a director of Washington Overall Manufacturing Company from January 12, 1946, to the present date. His brother, M. B. Comer, was vice president and a member of the board of directors of that company from January 12, 1946, until his death on June 26, 1953.

As trustee under the R. W. Comer & Sons Trust, Comer had the authority and duty to vote all voting stocks held by the trust.

On October 5, 1946, the charter of the petitioner was once again amended, this time raising the preferred stock to be issued from 10,000 shares to 20,000 shares without nominal or par value.

By December 31, 1950, petitioner had issued and outstanding $2,000,000 in preferred stock.

On or about July 23, 1951, all of the old notes payable of petitioner were given by Comer to the Church of Christ Foundation, Inc., sometimes hereinafter referred to as the Foundation. The Foundation was incorporated under the laws of the State of Tennessee on August 28, 1946. It had five incorporators, one of whom was the G. L. Comer here concerned, and another was his brother, M. B. Comer. The Foundation was ruled a tax exempt organization by the Internal Revenue Service on January 5, 1948.

Comer was elected vice president and a member of the board of trustees of the Foundation on December 20, 1946, and he served in such capacities through all years here concerned.

M. B. Comer was elected president and a member of the board of trustees of the Foundation on December 20, 1946, and served in those capacities until his death on June 26, 1953.

The old notes as given to the Foundation by Comer had outstanding balances thereon of $1,838,299.10.

On August 1, 1951, petitioner issued its unsecured, demand promissory note to the Foundation for $1,838,299.10. This action was authorized by the "entire outstanding voting stock" and board of directors of petitioner on July 23, 1951. The Foundation surrendered to the petitioner all the old notes at that time.

On December 27, 1951, about 5 months after petitioner issued its note payable to the Foundation for $1,838,299.10, Washington Overall Manufacturing Company transferred the total 1,000 shares of the outstanding common voting stock of petitioner to the Foundation.

Petitioner had paid only a very nominal amount of interest on the old notes outstanding against it up to the time (July 23, 1951) they were given to the Foundation by Comer. With only one exception, all the interest was paid prior to February 19, 1932. These payments were as follows:

| Paid to— | Amount |
|---|---|
| National Bank | $8,680.80 |
| Philadelphia Bank | 1,076.39 |
| American Bank | 7,994.00 |
| Nashville Trust | 7,164.83 |
| Fourth Banks (with respect to notes only) | 8,030.10 |
| Total | 32,946.12 |

The one exception occurring after February 19, 1932, was a $125,255.32 interest item collected by National Bank on August 17, 1936. This collection came about through a sale of collateral held by that bank. From this sale, $125,255.32 was applied by the bank to interest and $32,011.68 was applied to principal.

Petitioner never paid any interest on the account payable of $74,547.16 claimed to be due Fourth Banks. Moreover, petitioner never paid any interest on this item after it was converted to a note payable to Davis, Armistead, and Comer on July 1, 1943.

By November 24, 1954, petitioner had paid the principal amount due on its single note to the Foundation.

In addition to the payments of principal on the note payable to the Foundation, petitioner disbursed to the Foundation certain sums which it took as deductions in its income tax returns as follows:

| Year | Amount |
|---|---|
| 1951 | $42, 879. 12 |
| 1952 | 99, 268. 14 |
| 1953 | 99, 268. 14 |
| 1954 | 37, 705. 27 |

Each of the foregoing amounts was paid during the indicated year and was taken by petitioner as a deduction for interest in its income tax return for such year except the amount of $99,268.14 for 1953. With respect to the latter amount, $49,634.07 was paid during 1953 and a deduction taken therefor as interest in petitioner's income tax return for that year. The remainder, $49,634.07, was accrued by petitioner on December 31, 1953, but was not paid until February 2, 1954. This amount was deducted in petitioner's income tax return for 1953 as an expense.

In determining the deficiencies here involved the respondent determined that the above-mentioned deductions taken by petitioner for the years 1951 through 1954 were not allowable and gave the following explanation for his action:

The liability of $1,838,299.10 to the Church of Christ Foundation is not a bona-fide liability of the corporation, and the interest detailed above is not an ordinary and necessary business expense and is disallowed. The amounts are held to be contributions subject to the [statutory] limitations.

Petitioner also made donations or contributions to the Foundation in amounts and during the years indicated below, which sums were taken as deductions for contributions by the petitioner under section 23(q) of the Internal Revenue Code of 1939:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1946 | $20, 000 | 1951 | $8, 800 |
| 1947 | 10, 000 | 1952 | 1, 800 |
| 1948 | 7, 500 | | |
| 1950 | 12, 000 | Total | 60, 100 |

With only one exception, all the outstanding nonvoting preferred stock of petitioner was owned during all years here involved by various corporations (not less than 17 in number) whose outstanding common voting stock was owned 100 per cent by the petitioner. The one ex-

ception is that the Foundation was issued 1,845 shares of the stock on December 15, 1954, the shares being so transferred to it from Allen Garment Company. The entire outstanding voting stock of Allen Garment Company was during all years here concerned owned by petitioner.

### OPINION.

The petitioner takes the position that the amounts of $42,879.12, $99,268.14, and $99,268.14 paid by it to the Church of Christ Foundation, Inc., and deducted by it in its income tax returns for 1951, 1952, and 1953, respectively, constituted interest and were deductible as such under section 23(b) of the Internal Revenue Code of 1939, pertinent portions of which are set out below.[1] The respondent has determined and contends here that those amounts were not interest.

Deductions are a matter of legislative grace and one who seeks a deduction must bring himself clearly within the terms of the statute which grants the deduction. *New Colonial Ice Co.* v. *Helvering*, 292 U.S. 435, affirming 24 B.T.A. 886; *White* v. *United States*, 305 U.S. 281; *Interstate Transit Lines* v. *Commissioner*, 319 U.S. 590. The provision of section 23(b) of the Code of 1939 respecting the allowance of interest as a deduction "is designed to permit of the deduction of genuine interest on a genuine indebtedness." *Charles L. Huisking & Co.*, 4 T.C. 595. As used in section 23(b), interest "means compensation for the use or forbearance of money." *Deputy* v. *du Pont*, 308 U.S. 488; *Commissioner* v. *Park*, 113 F. 2d 352, affirming 38 B.T.A. 1118; *Autenreith* v. *Commissioner*, 115 F. 2d 856, affirming 41 B.T.A. 319. In order to be deductible "interest" must be paid on "indebtedness," which as used in section 23(b) means an existing, unconditional, and legally enforcible obligation for the payment of money. *Gilman* v. *Commissioner*, 53 F. 2d 47, affirming 18 B.T.A. 1277; *Commissioner* v. *Park, supra; Autenreith* v. *Commissioner, supra; United States* v. *Virgin*, 230 F. 2d 880.

The above-mentioned amounts, which the petitioner contends constituted interest and were deductible as such for the respective years in question, were paid by petitioner to the Foundation with respect to the demand promissory note for $1,838,299.10 which the petitioner issued to the Foundation on August 1, 1951. That note was issued to the Foundation with respect to the old notes payable of the petitioner

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.

with outstanding balances thereon totaling $1,838,299.10 which Comer had given to the Foundation on or about July 23, 1951, and which the Foundation surrendered to the petitioner when petitioner executed to it the note of August 1, 1951. Since, in disallowing the deductions in controversy, the respondent determined that the amount of the note of August 1, 1951, $1,838,299.10, was not a bona fide liability of the petitioner, the primary question for determination is whether such amount constituted "indebtedness" within the meaning of section 23(b) of the Code.

Comer's possession of the old notes payable of the petitioner with outstanding balances thereon totaling $1,838,299.10, and on the entire amount of which the Tennessee statute of limitations of 6 years concededly had run at the time Comer donated them to the Foundation, followed a series of events which for present purposes will be considered as having begun in the fall of 1942.

In the fall of 1942 the unpaid balance of the principal of the following notes issued by petitioner to the indicated banks was as shown below:

| Date issued | Payee | Unpaid balance |
|---|---|---|
| Sept. 8, 1930 | National Bank | $389,526.26 |
| Oct. 9, 1930 | Philadelphia Bank | 222,358.52 |
| Jan. 23, 1931 | American Bank | 444,121.69 |
| Jan. 23, 1931 | Nashville Trust | 71,893.64 |
| Total | | 1,127,900.11 |

No interest had been paid by petitioner on the foregoing notes since February 1932 except in the case of the note payable to National Bank. As to that note certain collateral was sold and in 1936 a portion of the proceeds of the sale was applied as interest and a portion applied on principal.

In the fall of 1942 all of the petitioner's outstanding capital stock consisting of 1,000 shares of a par value of $100 each or a total par value of $100,000 was owned by Fourth Banks. The latter held the following notes issued by petitioner and an account payable of the petitioner, having the indicated unpaid balances thereon:

| Date issued | Payee | Unpaid balance |
|---|---|---|
| Oct. 23, 1930 | Riggs National Bank | $5,250.00 |
| Nov. 16, 1930 | Fourth Banks | 5,444.50 |
| Jan. 23, 1931 | Fourth Banks | 351,329.00 |
| Jan. 23, 1931 | Fourth Banks | 324,570.00 |
| Total notes | | 686,593.50 |
| Account payable set up in April 1931. | Fourth Banks | 74,547.16 |
| Total | | 761,140.66 |

No interest had been paid by the petitioner on the foregoing notes since February 1932 and no interest was ever paid by petitioner with respect to the account payable. Prior to December 31, 1940, Fourth Banks had written off to a value of $1 on its books and records its investment in petitioner's stock and had written off to a value of $2 the foregoing notes and account payable. Fourth Banks had subrogated its claims against petitioner with respect to the foregoing notes and account payable to the claims of National Bank, Philadelphia Bank, American Bank, and Nashville Trust against petitioner with respect to the notes it had issued to them.

Furthermore, in the fall of 1942, the petitioner was a defendant in a suit pending in the Chancery Court at Nashville, Tennessee, which had been brought by Knox County, Tennessee, against the petitioner, Fourth Banks, and others. The suit had been tried but a decision therein had not been rendered. Except for being involved in certain litigation, as a plaintiff and as a defendant, the petitioner had not been engaged in any active business since late in 1931. On account of litigation the petitioner had been unable to liquidate and pay its creditor banks their pro rata part of its assets, the total actual market value of which, in the fall of 1942, was $51,531.20. Of that sum, $35,147.40 was cash and the remainder represented stocks and bonds. The above-mentioned suit brought by Knox County was the last remaining suit against petitioner. It was felt that if a judgment was entered against the petitioner in that suit, the creditor banks of petitioner would be forced to bring suit immediately so that one creditor would not be in a better position than the others, that if this was done petitioner doubtless would be forced into bankruptcy and as a result the creditor banks would receive very little of petitioner's assets.

In this situation Parkes Armistead, executive vice president of American Bank and a director of petitioner since February 1937, formulated a plan, which was agreed to by Fourth Banks, and which in substance provided for the immediate conversion to cash of the stocks and bonds then owned by petitioner and the distribution of the proceeds therefrom together with the cash on hand, excepting a small amount, to Armistead as reimbursement to him for payments to be made by him to the National, Philadelphia, and American Banks and Nashville Trust on account of the notes of petitioner owing to them.

In form the plan provided for the "sale" to Armistead without recourse by the National, Philadelphia, and American Banks and Nashville Trust of the notes owing to them by petitioner for a sum equivalent to 4½ per cent of the unpaid balance of the principal of the respective notes and the execution by those banks of releases of all claims they might have against Fourth Banks with respect

to the respective notes. The plan contemplated that after payment was made to the foregoing banks there would "probably be a little over $700 in assets remaining in the Company [petitioner]" to pay necessary expenses of petitioner.

In a letter to National Bank dated December 2, 1942, in which he informed that bank of the plan, Paul M. Davis, who was president of American Bank and who became vice president and director of petitioner on December 15, 1942, stated that Armistead had "worked out an arrangement where the creditor banks can get their money now without any liability on their part." He asked that the matter be given prompt attention "for fear some delay might interfere with the plan." In a letter to Philadelphia Bank dated December 2, 1942, in which he informed that bank of the plan, Davis stated that: "This is a recovery on our [American Bank's] part, and am sure it is on yours, as we had charged it off. As a matter of fact, we think we are faring exceedingly well in getting this *settlement*." (Emphasis added.) In asking for early attention to the matter Davis stated that he was "anxious to get it out of the way before something else happens."

By December 11, 1942, the National, Philadelphia, and American Banks and Nashville Trust had accepted the plan, executed the releases of their claims against Fourth Banks, and endorsed their notes without recourse, and the notes and releases were being held by American Bank for delivery to Armistead pending receipt from him of payment as provided in the plan. Thereafter, and during the period December 14, 1942, to December 28, 1942, Armistead paid to the respective banks a total of $50,741.67 with respect to the notes, physical delivery of which was made to him. After the foregoing payments, totaling $50,741.67, the total remaining unpaid balance of the notes was $1,077,158.44. The petitioner had completed conversion of its assets to cash and during the period December 15, 1942, to December 28, 1942, reimbursed Armistead to the extent of $43,741.67. On January 13, 1943, petitioner reimbursed him for the remaining $7,000 of his outlay. Since upon completion of the conversion of its assets to cash the petitioner had received a total amount which was not only sufficient to reimburse Armistead in full but also was sufficient to pay expenses of conversion and to pay the cost of the transfer stamps used in transferring petitioner's stock to Armistead, Davis, and Comer, and since after December 15, 1942, Armistead was not only a director but also was president of petitioner, it is not apparent from the record as to why completion of reimbursement to him was delayed until January 13, 1943.

At or about the time he formulated his plan respecting the notes the petitioner had issued to the National, Philadelphia, and American Banks and Nashville Trust, Armistead on November 20, 1942, sub-

mitted an offer to the board of directors of Fourth Banks to purchase for $1,000 all of the outstanding capital stock of petitioner. This offer was conditioned on a requirement by Armistead that if Fourth Banks accepted the offer, it would agree to pay or cause to be paid any judgment rendered against petitioner in the pending suit brought by Knox County up to but not exceeding $20,000. So far as determinable from the record the foregoing amount represented the largest amount of possible recovery against petitioner in that suit.

The minutes of the meeting of the board of directors held on November 20, 1942, show the adoption by the directors of a resolution authorizing and directing the president of Fourth Banks to sell, transfer, and convey to Armistead for $1,000 cash all of the outstanding capital stock in petitioner "and the notes and other claims of" Fourth Banks against petitioner "in the aggregate principal amount of $761,140.66" which theretofore had been subordinated to the claims of National, Philadelphia, and American Banks and Nashville Trust. It is not apparent from the minutes of the meeting why since Armistead had offered to pay $1,000 for the stock in petitioner the directors of Fourth Banks authorized and directed the sale to him for $1,000 not only of the stock but also of the notes and other claims of Fourth Banks against petitioner in the total amount of $761,140.66. The minutes do not show any apportionment, nor any basis for making an apportionment, of the $1,000 between the stock and the notes and other claims. Nor does the record otherwise disclose a basis for making such an apportionment. Doubtless on November 20, 1942, both the directors of Fourth Banks and Armistead were cognizant of the fact that petitioner's assets were sufficient to pay only a comparatively small percentage of the indebtedness owing by petitioner on its notes to the National, Philadelphia, and American Banks and to Nashville Trust, and that nothing was obtainable from petitioner by Fourth Banks with respect to its notes and claims.

Under date of December 7, 1942, Armistead, Davis, and Comer executed an instrument which recited that it was understood and agreed by them that Armistead was representing himself, Davis, and Comer in purchasing the entire capital stock of petitioner from Fourth Banks and also petitioner's indebtedness to that bank represented by notes and open accounts; also in the purchase of notes owed by petitioner to National, Philadelphia, and American Banks and to Nashville Trust; and that it was agreed that the purchase price of all of the notes and securities would be paid for by each of them paying one-third of the purchase price and receiving in return one-third of the stock, notes, and other indebtedness purchased.

Relying on the foregoing instrument, the petitioner asks that we find that Armistead, in acquiring the notes of petitioner owing to the National, Philadelphia, and American Banks and to Nashville Trust and in acquiring the notes of petitioner owing to Fourth Banks and that bank's claims against the petitioner and in acquiring all of petitioner's capital stock from Fourth Banks, represented himself, Davis, and Comer; that each of them became a one-third owner in each of the notes, in the claims of Fourth Banks against the petitioner, and in petitioner's capital stock; and that, in 1945, when Comer acquired the one-third stock interests of Armistead and Davis, he acquired their one-third interests in the above notes and a note of petitioner for $74,547.16 dated July 1, 1943, which had been issued to Armistead, Davis, and Comer with respect to the account payable in the same amount which Fourth Banks had held against petitioner.

We think it is clear from the record that it was pursuant to the arrangement Armistead had entered into with Fourth Banks that he, Davis, and Comer in December 1942, acquired from that bank all of the outstanding capital stock of the petitioner for $1,000.

When he formulated his plan for making payments to the National, Philadelphia, and American Banks and Nashville Trust, Armistead was a director of petitioner, and approximately at the time he began the final execution of the plan by making payments to the banks and the trust company, he also became president of petitioner. In each of those capacities his duty to the petitioner was to conduct its affairs in such a manner that neither he nor another could unduly profit from its desperately insolvent condition. Consequently, he was not in a position to employ what substantially in effect was the funds of the petitioner to acquire as his own the notes owing by petitioner to the above-mentioned banks and trust company and thereby become a creditor of the petitioner to the extent of the unpaid portion of the notes which was in excess of one million dollars. Since the record does not show that either Davis or Comer furnished any of the funds which were paid to the banks and trust company or which reimbursed Comer for the amounts he paid to the banks and trust company, and since Armistead did not acquire the notes as his property, we must conclude that Davis and Comer acquired no interest in them. Under the circumstances presented, physical surrender of the notes to Armistead constituted physical surrender to petitioner. Since a favorable settlement of the note indebtedness had been obtained, it follows that the petitioner's indebtedness on the notes had been extinguished. Although in 1945 when Comer acquired the stock of Armistead and Davis he may have come into physical possession of

the notes, he did not acquire any indebtedness represented by the notes because the indebtedness which they originally represented had theretofore been extinguished.

Respecting the notes of petitioner owing to Fourth Banks and the account payable of petitioner to that institution, the parties have stipulated that—

On December 11, 1942, the total outstanding capital stock of petitioner was acquired by Parkes Armistead, Paul M. Davis and G. L. Comer from Fourth & First Banks, Inc., together with notes payable and accounts payable to the said Fourth & First Banks, Inc., totalling $761,140.66 in principal amount, for a consideration of $1,000.00, * * *

Respecting Comer's acquisition of Armistead's and Davis' stock in petitioner in 1945, the stipulation of the parties shows that—

G. L. Comer purchased from Parkes Armistead and Paul M. Davis their respective interests in petitioner for the sum of $30,000.00 to each of them, or an aggregate of $60,000.00. * * *

And that—

a new certificate for 1,000 shares of common stock was then issued to G. L. Comer by petitioner on January 12, 1945. On such date he was the sole owner of record of petitioner's total outstanding voting common stock and his total investment therein was $60,333.00.

Since we have heretofore observed that the record affords no basis for allocating the consideration of $1,000 between the stock and the notes and the account payable, and since the parties have stipulated that Comer acquired the interests of Armistead and Davis in the petitioner for a total of $60,000, and that Comer's total investment for the entire stock was $60,333, we think it is only fair to conclude that $1,000 was paid for the stock and that nothing whatever was paid for the notes and account payable. Since the petitioner's entire assets were used in making the payments to the National, Philadelphia, and American Banks and Nashville Trust, in selling unliquidated assets, and for transfer stamps used in transferring petitioner's outstanding stock from Fourth Banks to Armistead, Davis, and Comer, we think that Fourth Banks in making physical delivery to Armistead of the notes owing to it and by transferring to him its claims against petitioner, surrendered and released to petitioner the indebtedness owing to it by petitioner which was represented by such notes and claims. Such surrender and release extinguished the indebtedness. Consequently, Armistead, Davis, and Comer did not acquire any interest in the indebtedness which had been represented by the notes and claims and, when Comer acquired the stock of Armistead and Davis in 1945, he did not acquire from them any interest in the notes or claims. Nor did he pay them anything with respect to any notes or

claims. Since petitioner's indebtedness with respect to the notes and claims had theretofore been extinguished, it follows that the note of petitioner for $74,547.16 dated July 1, 1943, and issued to Armistead, Davis, and Comer with respect to the account payable in the same amount which Fourth Banks had held against petitioner, was without consideration and consequently of no binding effect on petitioner. In this connection it is observed that there never was any corporate authorization for the issuance of this note.

The petitioner states on brief that after the acquisition of its stock by Armistead, Davis, and Comer in December 1942 and amendments to its charter changing its name and permitting it to engage in the merchandising business, its operations were profitable. The sales to Comer in January 1945 by Armistead and Davis of their one-third parts of petitioner's stock for $30,000 which had cost them only $333 approximately 2 years previously lends support to the foregoing statement of petitioner. However, despite the petitioner's prosperity, the record shows that from December 1942 until in July 1951 when Comer gave the notes in question to the Foundation, the petitioner paid nothing whatever on any of the notes, either as interest or as principal. The record discloses no explanation of petitioner's failure in the foregoing respect. Furthermore, the record fails to disclose that Armistead, or Davis, or Comer, ever made any demand on petitioner for or otherwise sought to obtain any payment either as interest or as principal, on any of the notes. Such a state of the record, we think, warrants the conclusion that during this period of upwards of 9 years, neither Armistead nor Davis nor Comer considered that petitioner was indebted to them with respect to any of the notes.

In July 1951 when Comer gave the notes in question to the Foundation, they did not represent any genuine and then existing indebtedness owing by petitioner to Comer or to anyone else. Nor did the notes in the hands of the Foundation represent such an indebtedness. Consequently, the demand promissory note issued by petitioner in August 1951 to the Foundation, and with respect to which the interest deductions here in question are sought, was merely a gratuitous promise by petitioner and as such it did not represent indebtedness within the meaning of section 23(b) of the Code.

The respondent's disallowance of the deductions in question is sustained.

Since by reason of the stipulation of the parties adjustments will be required in the respondent's determination, as to other matters,

*Decision will be entered under Rule 50.*