OPINION. Van Fossan, Judge: The major issue presents a question that, so far as we can discover, has never been answered judicially. It is, in essence, whether, under the provisions of section 204 (b) of the Kevenue Acts of 1936 and 1938, the statutory standard (the Convention Form), universally long accepted and established throughout the United States, which does not recognize transactions with unadmitted companies, shall govern the computation of income of insurance companies other than life or mutual, or whether the entire business done by such companies, including transactions with unadmitted companies, shall be considered as correctly reflecting income for a given year and therefore form the basis for such computation. The petitioners argue for the former method; the respondent for the latter. At the outset it is well to state the axiomatic fact that insurance bookkeeping and accounting are highly complicated processes. Of course all agree with the fundamental principle that, generally speaking, tax returns must truly reflect income. The problem here is to establish a basis of computation which will best accomplish that end, in view of the difficulties and complexities inherent in the insurance business and its calculations. Prior to 1921 no specific standard or requirements had been established to govern the return of insurance company income. The Revenue Act of 1921 however set up a definite standard by which such income was to be measured in 1922 and subsequent years. Helvering v. Oregon Life Insurance Co., 311 U. S. 267. Section 246 (b) (1) of that act is as follows: Sec. 246. (a) That, in lieu of the taxes imposed by sections 230 and 1000, there shall be levied, collected and paid for the calendar year 1922, and for each taxable year thereafter, upon the net income of every insurance company (other than a life or mutual insurance company) a tax as follows: ****** * (b) In the case of an insurance company subject to the tax imposed by this section— (1) The term “gross income” means the combined gross amount, earned during the taxable year, from investment income and from underwriting income as provided in this subdivision, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners. This subsection, in almost identical words, is succeeded by section 204 (b) (1) of the Revenue Acts of 1936 and 1938. The entire subdivision (b) appears below.[1] It is a well settled principle that laws are enacted, and hence must be interpreted, in the light of the commonly understood and accepted meaning of their language in the particular trade or business to which they are applicable. Willcuts v. Milton Dairy Co., 275 U. S. 215; O'Hara v. Lukenbach S. S. Co., 269 U. S. 364; Sonn v. Magone, 159 U. S. 417; Maddock v. Magone, 152 U. S. 368; Merton’s Law of Federal Income Taxation, ¶ 3.15. The legislative history of the tax statute relating to insurance companies plainly shows that Congress was well aware of the difficulty of imposing a proper tax on a business so complex and technical as insurance. An amendment to the existing statute was offered by Senator Simmons and passed by the Senate (Congressional Record, vol. 57, p. 670) providing a new system of insurance taxation to be incorporated in the 1918 Act, but the House failed to concur (Conference Committee Report, p. 72). Thereafter an extended discussion of the problem ensued before the 1921 Act was passed. The following is an excerpt from the hearings on H. R. 8245 (the Revenue Act of 1921) before the Committee on Finance, United States Senate, 67th Congress, 1st session, p. 394 (confidentially printed but released by the Joint Committee on Internal Revenue Taxation for public use and reference): Senator Smoot: If you have other amendments, present them now, Dr. Adams. Db. Adams : Let me take up fire and miscellaneous insurance companies This is an important matter. At the present time you have a special scheme of insurance for life insurance companies, and the first insurance companies are left under existing law. The law relating to insurance companies to-day is highly defective. Under the strict letter of the law there is a possibility of duplicating the same deductions three times. The difference arises from attempting to apply deductions applicable to ordinary corporations to insurance companies and then adding certain special deductions to which insurance companies are entitled. In the pian presented here the income and deductions are expressed in their own technical terms. All these Insurance companies, as you know, have to make reports every yea*. Those are uniform reports. They are carefully worked out, and the interests of the public are properly safeguarded. In the proposed amendment the terms used in this report are employed. It starts out in this way: The ordinary insurance company has a possibility of making two kinds of profits; that Is, it collects premiums from policyholders and on these it may make an underwriting income. Then they invest these funds, and have an investment income, and there is a possibility of a net income from that source. This plan starts out by saying that insurance companies shall be taxed upon their net .underwriting income plus their net investment income, if any. Then the whole scheme of computing net income has, as is necessary in the case of insurance companies, to be on the accrued or incurred basis instead of on the actual cash basis. That is the basis of this uniform report, and it is adopted here. ******* It is obvious from the above discussion and explanation that Congress comprehended the completely universal use of the Convention Form; that it conformed the phraseology of the statute to the technical terms appearing in the form; that for Federal tax purposes it adopted bodily the Convention Form and its method of reporting its transactions resulting in income, and that it had a thorough knowledge of the provisions of the form properly safeguarding the interests of the public. The Convention Form does not recognize the petitioner’s transactions with unadmitted companies. Such transactions do not enter into its income as set forth on the Convention Form and are not permitted to be included in any of the calculations there appearing. The entire Federal tax structure is a creature of Congress. That legislative body has laid down generally the basis on which tax must be computed and paid. It has granted complete tax exemption to certain classes of taxpayers. It has allowed credits and deductions in circumstances explicitly defined. It has set up specific standards by which certain taxpayers must be measured in order to ascertain the statutory tax which they shall pay. Congress has seen fit to enact a special statute governing the imposition of tax upon “insurance companies other than life or mutual * * * in lieu of the tax imposed by sections 13 and 14.” It established the Convention Form as the standard for determining the tax on such companies. Therefore, the Convention Form as understood, followed, and applied in the insurance world must control the computation of income of the petitioners, insurance companies other than life or mutual. The respondent argues that, since the various definitions contained in section 204 (b) did not refer specifically to “unadmitted companies,” “unauthorized reinsurance,” and other such phrases, income from transactions with unadmitted companies should be. included in the petitioners’ returns. However, as we have seen, this does not follow. The Convention Form itself ignores such items and usage, and the specific prohibition by state authority has compelled their omission. As was stated in the above quoted discussion of the Senate Finance Committee, the very terms of the Convention Form were incorporated into the statute in their own “technical” words. Congress has taken the Convention Form as its pattern for this peculiar legislation. It should be followed precisely according to its terms and as employed, accepted, and complied with throughout the United States. The petitioners make the comment that the rule sought by them is a practical one as well as one required by law. They say that in the long run the tax consequences are bound to be of no importance but that the disruption of the accepted practice results only in confusion and expense to insurance companies and added burdens of administration by the Bureau of Internal Revenue. We believe that this observation is pertinently made, since the items relating to transactions with unadmitted companies are generally reflected in cash charges or credits when such transactions are completed. Hence, over a period of years doubtless approximately the same amount of income would be earned and tax paid thereon by the use of either method. The case of United States Merchants & Shippers Insurance Co., 13 B. T. A. 164, in which the position taken by the respondent was directly opposite that now assumed, was decided by us on facts quite similar to those now before us. Although the decision in that-case involved 1921 income, it was not governed by section 246 of the Revenue Act of 1921, which first applied to 1922 income. The decision did not purport to be an interpretation of section 246 (b) of the 1921 Act. With respect to the respondent’s argument that if adjustments were made in the petitioners’ income relating to unauthorized insurance, and thereby their income were decreased, no decreases should be considered because of prior tax advantage, we have only to say that, under our decision on the primary issue, no such adjustments will be made. The issue thus becomes moot. The petitioners have not included their Factory Insurance Association business in. their income tax returns. That business was set forth on the Convention Form and therefore must be included in such returns. The petitioners concede that this procedure is proper, although the respondent made no adjustments in his notice of deficiency relating to the Factory Insurance Association transactions. Due consideration will be given to this concession upon the recomputation of the petitioners’ income. The facts relating to the alleged loss sustained by the petitioner, New Hampshire, on the purchase and sale of its own stock are so clear that the issue is comparatively simple. The petitioner sold its stock in 1929 to certain of its West Virginia agents at $60 per share. In 1936 the market price had dropped to about $42 per share. The agents became dissatisfied with their investment. Acting upon the authority of an officer of the petitioner, Stephan purchased 100 shares of New Hampshire stock for $5,775. The petitioner later paid the purchase price and acquired the stock. The purpose of purchasing the stock was to “keep faith” with the agents. The petitioner’s officers considered it good business to redeem its stock at approximately the price paid by the agents but felt under no obligation, legally or otherwise,, to do so. It is apparent from the facts that the petitioner paid its purchase price of $5,775 for a purpose other than the acquisition of the securities. Estate of J. B. Monroe, 45 B. T. A. 1060; affd., 132 Fed. (2) 126. The market price at that time was $42 or $43 and the stock was later sold at approximately that figure. Thus the transaction resulted in no gain or loss. The excess over market paid by Stephan did not represent a part of the cost, even if it can be said that the market price was the real cost basis. Majestic Securities Corporation v. Commissioner, 120 Fed. (2d) 12, affirming 42 B. T. A. 698. The moral obligation to keep faith with the petitioner’s agents was not a proper element of cost. Burns v. Commissioner, 31 Fed. (2d) 399. Prices in excess of market paid for personal reasons are not the correct measure of cost. Anna L. Raymond, 40 B. T. A. 244; affd., 114 Fed. (2d) 140; Donald McDonald, Jr., 28 B. T. A. 64; cf. Hugh M. Matheson, 31 B. T. A. 493. Thus, in view of the circumstances surrounding the repurchase of the petitioner’s stock, no deductible loss is allowed. The final issue in controversy is the propriety of accruing in 1935-income and expenses in connection with the impounded “Missouri rate case” premiums. The petitioner, New Hampshire, ,so accrued the premiums and expenses in the estimated amounts of $60,000 and $25,000, respectively, reported the difference, $35,000, as taxable income on its return for the year 1935, and paid the tax thereon. In the last analysis the question is whether or not the petitioner, on the accrual basis, was justified in believing in 1935 that it was entitled to $60,000 of the impounded premiums and that its expenses chargeable to the litigation would be $25,000, and hence correctly accrued these items on its books for that year. We believe that it was. In November 1935 the petitioner was notified by the Subscribers Actuarial Committee that shortly after December 31, 1935, the court would direct distribution of the impounded premiums, except as to amounts affected by intervention. In November only one policyholder had intervened, but the court held that other policyholders had the right to intervene and disclaim on or before December 31, 1935. The petitioner was assured that such intervention did not interfere with the distribution of the remaining premiums. Consequently, in December 1935 the petitioner became virtually certain that it would receive a large portion of its impounded premiums, provided no widespread intervention would develop. In January 1936, before the petitioner closed its books, it learned that no other policyholder had intervened and that thus the door was closed to further doubt concerning its receipt of the premiums. The petitioner was informed that a claim for attorneys’ fees had been filed, but that matter did not relate to the basic determination of the case; only to administration expenses. The amount was less than the petitioner’s impounded premiums, and “numerous” companies were parties to the proceedings. It is fair to assume that the claim for fees, if allowed in full, was expected to have very little effect on the amount finally paid to the petitioner. While the petitioner’s books for the year 1935 were still open, there remained nothing to be done except to carry out the terms of settlement and to dispose of the minor matter of attorneys’ fees. Under these circumstances the petitioner was led to believe, and properly so, that it was entitled to receive, and therefore to accrue, at least $60,000 of the impounded premiums, and it estimated that its cost in securing the return of premiums would be $25,000. Subsequent payment of both premiums and expenses indicates that its estimates were quite accurate. The petitioner relies on Brooklyn Union Gas Co., 22 B. T. A. 507; affd. 62 Fed. (2d) 505, in which the situation was very similar to that now before us. The respondent argues that this Court has departed from the theory of that case in its decision in Clifton Manufacturing Co., 1 T. C. 71. We do not agree with the respondent’s view. In the Clifton case the decision was predicated on a set of facts which we thought did not warrant the accrual. However, the Circuit Court of Appeals reversed us. Clifton Manufacturing Co. v. Commissioner, 137 Fed. (2d) 290. There the court stated that “complete solvency of the debtor became practically certain at least a year before the debt was paid so that its accruability was then established.” [Emphasis supplied.] The court considered that the facts rendered the debt practically sure of payment. The same principle applies here. The petitioner sought to recover its own premiums which had been withheld through litigation. The outcome of the case was fixed by the settlement decree and the failure of policyholders to intervene. The subsequent actions of the court were mere formalities and had no vital bearing on the basic decree releasing the funds. These circumstances inspired in the petitioner that reasonable certainty upon which the accrual should have been and was based. The petitioner is sustained on this issue. Decisions will be entered imder Buie 50. SEC. 204. INSURANCE COMPANIES OTHER THAN LIFE OR MUTUAL. **««*«* (b) Definition of Income, Etc. — In the case of an insurance company subject to the tax imposed by this section— (1) Gnoss income. — “Gross income” means the sum of (A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Com. missioners, and (B) gain during the taxable year from the sale or other disposition of property, and (C) all other items constituting gross income under section 22; (2) Net income. — “Net income” means the gross income as defined in paragraph (1) of this subsection less the deductions allowed by subsection (c) of this section; (3) Investment income. — “Investment income” means the gross amount of income earned during the taxable year from interest, dividends, and rents, computed as follows: To all interest, dividends and rents received during the taxable year, add interest, dividends and rents due and accrued at the end of the taxable year, and deduct all interest, dividends and rents due and accrued at the end of the preceding taxable year; (4) Undebwriting income. — “Underwriting income” means the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred; (5) Premiums earned. — "Premiums earned on insurance contracts during the taxable year” means an amount computed as follows: From the amount of gross premiums written on Insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance. To the result so obtained add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year; (6) Losses inceered. — "Losses incurred” means losses incurred during the taxable year on insurance contracts, computed as follows : To losses paid during the taxable year, add salvage and reinsurance recovarable outstanding at the end of the preceding taxable year, and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year. To the result so obtained add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year ; (7) Expenses incurred. — “Expenses incurred” means all expenses shown on the annua! statement approved by the National Convention of Insurance Commissioners, and shall be computed as follows: To all expenses paid during the taxable year add expenses unpaid at the end of the taxable year and deduct expenses unpaid at the end of the preceding taxable year. For the purpose of computing the net income subject to the tax imposed by this section there shall be deducted from expenses incurred as defined in this paragraph all expenses incurred which are not allowed as deductions by subsection (c) of this section.