GLEN A. JORDAN AND VIRGINIA D. JORDAN, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2520–68, 2521–68, 3184–70. Filed September 12, 1973.

---

[1] Cases of the following petitioners are consolidated herewith: Insurance Sales & Management Co., docket No. 2521–68; and Glen A. Jordan and Virginia D. Jordan, docket No. 3184–70.

*W. Dane Clay*, for the petitioners.
*Thomas J. Miller*, for the respondent.

WILES, *Judge:** Respondent determined deficiencies in petitioners' income taxes for the years 1962 through 1966 in the amounts as follows:

GLEN A. AND VIRGINIA D. JORDAN

| Year | Amount of deficiency |
|------|---------------------|
| 1962 | $103, 591. 00 |
| 1963 | 24, 731. 00 |
| 1964 | 13, 267. 00 |
| 1965 | 62, 005. 99 |
| 1966 | 1, 946. 67 |

INSURANCE SALES & MANAGEMENT CO.

| Year | Amount of deficiency | Addition to tax sec. 6651(a) |
|------|---------------------|------------------------------|
| Oct. 31, 1963 | $1, 675. 57 | |
| Oct. 31, 1964 | 648. 08 | $97. 21 |

Several issues have been settled by the parties prior to this trial. The remaining issues are:

(1) Whether expenditures by petitioner which resulted in the acquisition of stock are allocable to the cost basis of the stock received. Alternatively, if the expenditures are not entirely allocable to cost,

---

*Pursuant to a notice of reassignment sent to counsel for the parties, and to which no objections were filed, this case was reassigned by the Chief Judge on Oct. 25, 1972, from Judge Craig S. Atkins to Judge Darrell D. Wiles for disposition.

whether they are capital in nature because they related back to prior transactions in which capital gains were realized under *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952).

(2) Whether the income and deductions of Insurance Sales & Management Co. should be attributable to its sole stockholder and president, Glen A. Jordan, under section 61 or 482.[2]

(3) Whether the failure of Insurance Sales & Management Co. to file a timely U.S. income tax return for the fiscal year ending October 31, 1964, was due to reasonable cause.

FINDINGS OF FACT

## General

Some of the facts have been stipulated and are found accordingly.

Glen A. Jordan (hereinafter referred to as petitioner) and Virginia D. Jordan are husband and wife who were legal residents of Hot Springs, Ark., when the petition was filed. They filed their joint Federal income tax returns for the years 1962, 1963, and 1964 with the district director of internal revenue, Chicago, Ill. They filed their joint Federal income tax returns for the years 1965 and 1966 with the district director of internal revenue, Little Rock, Ark.

Insurance Sales & Management Co. (hereinafter referred to as Management Co.) was incorporated in the State of Illinois. It filed its corporation income tax returns for years ending October 31, 1963 and 1964, with the district director of internal revenue, Chicago, Ill. At the time of the filing of the petition, its principal office was in Hot Springs, Ark.

## Issue 1. Expenditures for Acquisition of Stock

Prior to the year 1960, petitioner was engaged in the mobile home business in Illinois. He was also a motel owner in Silvis, Ill. On March 23, 1960, petitioner and six individuals organized an insurance company named Republic Life Insurance Co. (hereinafter referred to as Republic) which was incorporated under the laws of the State of Illinois.[3] The company's articles of incorporation authorized 1,250,000 shares of voting common stock.

Republic entered in a contract with Quad City Securities Corp. (hereinafter referred to as Quad City) whereby the latter agreed to undertake the solicitation and sale of the authorized stock of the life insurance company on a best-efforts basis. Quad City was organized

---

[2] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.

[3] The six individuals who organized Republic with petitioner were Earl C. Hudgens, Julius M. Lytton, John K. Shamburger, Verlin Chapman, Walter H. Flannigan, and William M. Dalton.

and owned by petitioner and three of the individuals who were also incorporators of Republic.[4] In accordance with the plans of the incorporators, a minimum of 85 percent of the gross proceeds received by the company from the solicitation of preorganization subscriptions was to be paid to Republic. The other amount not to exceed 15 percent was to be paid to Quad City for commission and other expenses incident to organization of the company.

On March 23, 1960, a prospectus was issued whereby Quad City offered for sale only in the State of Illinois to bona fide residents of Illinois, under a permit issued by the director of insurance of the State of Illinois, 1 million shares of stock in Republic at $4 per share. It was planned that the remaining 250,000 shares of the authorized but unissued common stock would be disposed of through stock options to salesmen and key personnel of Republic. It was also contemplated that the incorporators would receive a portion of the option shares. In no case was it planned to grant any option in which the option price would be less than $4 per share, that being the same price which all other original subscribers had paid, and in no case was any option to be given for a period of more than 5 years after receipt by the company of a certificate of authority from the director of insurance to engage in such business.

On September 14, 1961, Republic entered into a stock purchase agreement with petitioner, Julius M. Lytton, John K. Shamburger, and Earl C. Hudgens, whereby those individuals agreed to purchase, in the aggregate, 160,000 shares of the option common stock of the company on or before the expiration of 5 years from the issuance of the State permit at a price of $4 per share. Under this agreement, petitioner agreed to purchase 40,000 shares for a total consideration of $160,000. It was understood and agreed that the $4 per share was based upon the price per share of stock at its original issue price.

All 1,250,000 authorized shares of common stock had equal rights. However, each of the subscribers of the 1 million original shares agreed that he would not sell, offer for sale, or otherwise dispose of, directly or indirectly, any of the stock which he would own as a result of the subscription after its issuance, for a period of 10 months after receipt of the certificate of authority to engage in the life insurance business. In the event the subscriber desired to sell his stock from the 10th to the 30th month after receipt of such certificate, the subscriber gave the insurance company, or a security dealer designated by it, an option to purchase the stock which he would then own, at his cost, plus 1 percent for each month the subscriber retained the ownership after receipt of the certificate of authority. This option expired 30 months

---

[4] The three individuals who organized Quad City with petitioner were John K. Shamburger, Julius M. Lytton, and Earl C. Hudgens.

after the date of the receipt of the certificate of authority, at which time the subscriber would be free to sell or otherwise dispose of his stock at market prices. A further provision in connection with the subscriptions for stock was that in the event of extreme emergency or distress during the first 10 months, or in the event of other unusual circumstances, the company or the security dealer designated by it would repurchase all or part of the stock of any stockholder so situated at the stockholder's cost, plus 1 percent per month. The board of directors had the exclusive authority to determine the existence of such emergency, distress, or unusual situation. Quad City was designated as the securities dealer who had the right to repurchase the shares. On the other hand, the shares offered to the incorporators under the September 14, 1961, agreement were unrestricted as to their sale.

Republic received its certificate of authority to commence operations from the director of insurance of the State of Illinois on July 14, 1961, after "preorganization subscriptions" had been sold to approximately 4,173 residents of the State of Illinois. It began soliciting applications for life insurance policies on August 14, 1961.

The common stock of Republic, including original and option shares, was split 4 for 1 pursuant to stockholders' action at a meeting held August 2, 1961. Approximately 86 percent of the company's outstanding shares were represented by proxies at the shareholders meeting. Neither the notice of the meeting nor the proxies received with the subscription agreements disclosed that the shares to be offered for sale to the promoters were unrestricted as to their future sale. The shareholders of the company at the meeting on August 2, 1961, were not expressly advised at any time of the fact that the shares authorized for issuance to the promoters would not contain the same restrictions as were placed on shares sold to the general public through preorganization subscriptions.

During 1962 petitioner sold subscription rights to Quad City without exercising such rights under the stock purchase agreements. Quad City then exercised those rights and sold the stock to the public. The stock certificates issued for these subscription rights contained no restrictions as to their disposition. In 1962 petitioner reported sale of these rights as giving rise to long-term capital gains of $187,736.

Stockholders of Republic filed several lawsuits in 1964 against the company and its incorporators, including petitioner, claiming that they had been misled in making investments in Republic and that U.S. securities laws had been violated. Petitioner was advised by counsel that there may have been technical violations of the securities acts because there had not been full disclosure of the fact of the absence of restrictions on the stock issued to the promoters. Therefore, petitioner, Julius M. Lytton, and John K. Shamburger offered to purchase

159,872 common shares of the insurance company stock sold by Quad City during the period November 4 through November 7, 1962, by refunding the entire purchase price paid for such shares together with interest at the rate of 5 percent per annum from the date of sale of the stock to the present date. This offer, entitled "Offer of Rescission," was made in a prospectus dated November 10, 1965, after months of negotiation and revisions with the Federal Securities and Exchange Commission. Pursuant to the offer of rescission, petitioner acquired 38,367 shares of Republic at prices ranging from $4.05 to $10.85 per share during the period of November 10, 1965, through March 1966.

In the taxable year 1965 petitioner claimed an ordinary business deduction of $194,795.26, relating to payments made under the rescission offer. This amount represented the excess of the purchase price over what the petitioner contended was the fair market value of the stock as of that time plus certain expenses, such as bank expenses, transfer taxes, legal and accounting expenses, applicable to the offer of rescission. Petitioner also claimed a deduction of $44,246.14 for interest paid through the Continental First National Bank & Trust Co., Chicago, Ill., which handled the rescission offer transaction. On the 1965 income tax return petitioner made the following statements:

During 1965 taxpayer husband purchased 38,066.25 shares of common stock of the Republic Investors Life Insurance Company at a cost of $265,190.81 and incurred expenses pertaining thereto of $5,736.95. The fair market value of the stock at the time of purchase was $2.00 a share or $76,132.50.

The purchase of these shares of stock were from the individual holders thereof and was for the purpose of protecting taxpayer's business reputation and future earnings and not for the purpose of acquiring any further common shares of Republic Investors Life Insurance Company. There was a possible violation of S.E.C. requirements. This purchase was handled through the Trust Department of the Continental Illinois National Bank and Trust Co., Chicago, Illinois.

| | |
|---|---:|
| Purchase price of 38,066.25 shares | $265,190.81 |
| Less: Fair market value | 76,132.50 |
| Excess of purchase price over fair market value | 189,058.31 |
| Bank expense | 1,478.00 |
| Transfer taxes | 97.35 |
| Legal and accounting | 4,161.60 |
| Total deductible expense | 194,795.26 |

These claimed deductions gave rise to a reported loss on the 1965 return of $123,312.03 and formed the basis for a net operating loss carryback of $117,354.21, for the taxable year 1962 resulting in the allowance of the tentative adjustment and refund in tax of $58,657.93 plus interest. In 1966 petitioner paid an additional amount of $2,635.50 to purchase shares of Republic pursuant to the offer of rescission and

paid the total amount of $9,063.95 for printing, accounting, and legal expenses pertaining to the offer of rescission. On their U.S. tax return for the taxable year 1966 petitioners claimed $9,921.17 thereof plus the amount of $76,132.50 as the cost of the shares of Republic purchased pursuant to the offer of rescission and sold on April 12, 1966, for $118,152 and reported the difference of $32,098.33 as short-term capital gain.

Petitioner became chief executive officer of Republic in August 1961 and chairman of the board of directors in March 1962, both positions which he retained until April 1966. Petitioner was also chairman of the board of directors and principal executive officer of General Life of Iowa Insurance Co., General Life of Missouri, and Sterling Life Insurance Co. during most of the time at issue.

*Issue 2. Income and Deductions of Insurance Sales & Management Co.*

On or about November 1, 1962, petitioner organized the Management Co. under the laws of the State of Illinois. An agreement was entered into between Republic and Management Co. whereby override commissions would be paid to the Management Co. During the years in issue, the Management Co. was wholly owned by the petitioner. Also, during this period, petitioner, along with a group of men under his supervision, was engaged in managing the operations of the following insurance companies: Republic Investors Life Insurance Co., General Life of Iowa Insurance Co., General Life of Missouri Insurance Co., and Sterling Life Insurance Co. of Denver, Colo.

Petitioner was the only employee paid by the Managment Co. during the period 1962 through 1966. All of the services performed under the contract between Republic and the Management Co. were performed directly or indirectly by petitioner. Such services were performed indirectly by petitioner by virtue of utilization of what petitioner called his "management group." This group consisted of approximately 20 men, all of whom were employed by insurance companies managed by petitioner but none of whom were employed or paid by the Management Co.

In 1965 and 1966 Management Co. also engaged in the business of renting airplanes. The Management Co. received income during the years in issue as follows: Commission from Republic—$239,268.39, airplane rental income—$27,407.37, and miscellaneous income—$1,302.-50. It paid to petitioner as "salaries and consulting fees" the amount of $157,926.12, retaining the balance for payment of expenses.

At all times Management Co. maintained its own bank accounts and records, received all of its own income, and paid all of its own expenses.

After its organization, the Management Co. received override commissions from Republic, most of which were paid to petitioner as "consulting fees." Petitioner received no salary from the Management Co. in his capacity as chairman of the board and chief executive officer.

### Issue 3. Failure to File Timely Return

The tax return for fiscal year ending October 31, 1964, was due on January 15, 1965. The Management Co. secured an automatic extension of 3 months, but did not file its return until July 15, 1965.

OPINION

### Issue 1. Expenditures for Acquisition of Stock

The first issue is whether the payments made by petitioner upon the acquisition of the Republic stock under the offer of rescission transaction are entirely allocable to the cost of the stock. If the payments made by petitioner are not entirely allocable to the cost of the stock, a further issue is whether the amounts not so allocated are capital in nature because they relate back to prior transactions in which capital gains were realized by petitioner, or are deductible as ordinary and necessary business expenses.

Generally no gain or loss is realized on the purchase of assets. It is not until the final disposition of property that gain or loss will be recognized for tax purposes. *Loewi & Co.*, 23 T.C. 486 (1954), aff'd. 232 F. 2d 621 (C.A. 7, 1956) ; *W. L. Dunn*, 14 B.T.A. 13 (1928). However, when a taxpayer pays more than the fair market value for the purchase of an asset and the excess payment is for a purpose other than the acquisition of the property, that excess amount is not included in the cost of the property. *Majestic Securities Corp.* v. *Commissioner*, 120 F. 2d 12 (C.A. 8, 1941), affirming 42 B.T.A. 698 (1940) ; *New Hampshire Fire Insurance Co.*, 2 T.C. 708 (1943).

Petitioner contends that he entered into the offer of rescission transaction in order to protect his business reputation and that the acquisition of stock was "purely incidental." As such, he contends that all sums expended are deductible as ordinary and necessary business expenses reduced, however, by the fair market value of the Republic stock which he received. Respondent contends that all of the expenditures are includable in the cost basis of the stock.

The decision in this case is one of fact which depends upon the substance of the offer of rescission transaction. We cannot accept petitioner's novel approach to the issue, for the facts do not support it. Petitioner's approach would relegate the acquisition of the stock to a minor position in the transaction. Petitioner and the other individuals involved were informed by legal counsel that they were in possible

violation of the SEC rules. Petitioner became convinced that any action by the SEC would bring great harm to his business reputation and ability to generate future earnings in the insurance field. The action decided upon to avoid possible SEC action was the purchase of Republic stock at the price originally paid for it by the shareholders. The acquisition of the stock was not "purely incidental" to the transaction. Quite the contrary, such acquisition was the very essence of petitioner's attempt to avoid damage to his business reputation. Undoubtedly petitioner believed that the offer of rescission transaction represented, as well as a purchase, the best means for achieving his goals. However, petitioner's dual motive in purchasing the stock does not necessarily indicate that the amount paid is for something other than the purchase of assets. Given these circumstances, we hold that the amount paid through the offer of rescission cannot be divided between an amount paid for the stock and an amount paid in defense of petitioner's business reputation. Petitioner paid a price measured by the amount originally paid by the sellers for the stock. The fact that he may have entered into a poor economic transaction is irrelevant. See *Hugh M. Matheson*, 31 B.T.A. 493 (1934), affd. 82 F. 2d 380 (C.A. 5, 1936).

Petitioner contends that the fair market value of the stock at the time of its acquisition was $2, while the respondent claims that the fair market value was the amount paid. The only evidence petitioner introduced to prove the fair market value of the stock was the offer of rescission prospectus which showed a high bid price on November 8, 1965, of $2 per share as reported by the National Quotation Bureau, Inc. Petitioner also testified at trial that he could have gone into the open market and purchased the stock at $2 per share during the entire period of the rescission offer. He offered no proof that the stock retained a market value of $2 after November 8, 1965. The date of the prospectus was November 10, 1965, and the purchases were made from that date until March 1966. On April 12, 1966, petitioner sold the shares acquired under the offer of rescission for $118,152, a price more than 50 percent in excess of the fair market value claimed by petitioner during the period only 2 months earlier. We cannot accept petitioner's contention that the stock involved in the offer of rescission had a fair market value of $2 during the entire period covered by the offer of rescission. Nor does the record contain any evidence on which a determination of fair market value of the stock can be made. Therefore, we hold that the fair market value of the stock was the amount actually paid by petitioner.

The cases excluding from the cost basis of property an amount paid in excess of fair market value are distinguishable. In *Majestic Securities Corp.* v. *Commissioner, supra,* the taxpayer purchased securities from a bank at a price greater than the current fair market value. Ma-

jority shareholders of the taxpayer corporation had a financial interest in the bank which sold the securities at the higher price. In *New Hampshire Fire Insurance Co., supra*, an insurance company purchased stock from some of its agents at a price in excess of the current fair market value because it felt compelled to do so under a "moral obligation to keep faith with its agents." In both cases the purchase of stock at a price in excess of fair market value was based on the relationship between the parties. See also *Anna L. Raymond*, 40 B.T.A. 244 (1939), affd. 114 F. 2d 140 (C.A. 7, 1940), certiorari denied 311 U.S. 710 (1940) ; *Donald McDonald, Jr., Administrator*, 28 B.T.A. 64 (1933). That is, the price was not set between two parties dealing at arm's length based on the value of the stock to either party, but rather by a desire of the buyer to enhance the financial position of the seller. In the present case the petitioner's only desire was to protect his business reputation; that desire resulted in a higher price per share than would have been paid under normal circumstances. However, the purchase price resulted from petitioner's unfortunate position rather than a desire to aid the seller.

Petitioner cites *James E. Anderson*, 56 T.C. 1370 (1971), revd. 480 F. 2d 1304 (C.A. 7, 1973) ; *Laurence M. Marks*, 27 T.C. 464 (1956) ; and *William L. Butler*, 17 T.C. 675 (1951), as support for the proposition that his "excess" expenditures are ordinary and necessary business expenses. It is not necessary to examine those cases in great detail to determine that they are clearly distinguishable from the present situation. It is sufficient to note that the taxpayers in those cases did not receive any assets in return for their expenditures. They are relevant for a determination of whether expenses are ordinary and necessary business expenses, but not for the question of whether expenditures were made for the purchase of stock or for some other reason.

Petitioner contends that the amounts denominated as interest on the offer of rescission are deductible as interest under section 163. Section 163 [5] allows deductions for all interest paid within the taxable year on indebtedness, and regardless of whether the expenses are business oriented or personal in nature. Petitioner cannot prevail on this issue because there was in fact no indebtedness. For purposes of section 163, indebtedness means an existing, unconditional, and legally enforceable obligation for the payment of money. *First National Co.*, 32 T.C. 798 (1959), reversed on other issues 289 F. 2d 861 (C.A. 6, 1961) ; *William Park*, 38 B.T.A. 1118 (1938), affd. 113 F. 2d 352 (C.A. 3, 1940). In the present case, the amounts denominated as interest were merely a part of the total purchase price paid for the Republic stock.

---

[5] SEC. 163. INTEREST.

 (a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

We hold that such amounts are not deductible as interest under section 163.

The final question concerns expenses paid by petitioner which were applicable to the offer of rescission. The payment of bank expenses, transfer taxes, and legal and accounting fees arose as a result of petitioner's decision to enter the offer of rescission transaction. As such, they were additional capital expenditures made for the purchase of stock which should be included in the cost basis of the stock. See *Woodward* v. *United States*, 397 U.S. 572 (1970); *Atzingen-Whitehouse Dairy, Inc.*, 36 T.C. 173 (1961).

Since we hold that the entire amount expended by petitioner must be included in the cost basis of the stock, we do not reach respondent's alternative argument that any excess over fair market value should be characterized as a capital loss.

### *Issue 2. Income and Deductions of Insurance Sales & Management Co.*

The second issue is whether the income and deductions of Management Co. for fiscal years ending October 31, 1963, through October 31, 1966, are attributable to petitioner or the corporation. Respondent contends that the income and deductions of the Management Co. are attributable to petitioner. Respondent bases his contention on application of sections 61 and 482.

Section 482 [6] allows the Commissioner to allocate between any two or more organizations, trades, or businesses gross income or deductions if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses. The Commissioner has considerable discretion in applying section 482 and his determinations must be sustained unless he has abused his discretion. His determinations may be reversed only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. *Pauline W. Ach*, 42 T.C. 114, 126 (1964), affd. 358 F. 2d 342 (C.A. 6, 1966), certiorari denied 385 U.S. 899 (1966); *National Securities Corporation*, 46 B.T.A. 562, 564 (1942), affd. 137 F. 2d 600 (C.A. 3, 1943), certiorari denied 320 U.S. 794 (1943). The evidence in this case indicates that the Commissioner's determination must be sustained. Petitioner was in the business of managing life insurance companies. Therefore, the Commissioner has the power to allocate income or de-

---

[6] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

ductions between the corporation and the petitioner. *Borge v. Commissioner*, 405 F. 2d 673 (C.A. 2, 1968); *Richard Rubin*, 56 T.C. 1155 (1971), affirmed per curiam 460 F. 2d 1216 (C. A. 2, 1972).

The evidence indicates that petitioner performed the services in question and received the payment of commissions therefor with little regard to the existence of the Management Co. Petitioner admittedly performed all of the services of the corporation, however, there is no indication from the evidence that petitioner ever entered into any contract with Management Co. for the performances of his services. In fact, petitioner testified that he provided services for Management Co. by virtue of utilizing a so-called management group of individuals who were employed by other insurance companies that he managed. None of these individuals were employed or paid by the Management Co. It is not clear whether they performed services for the petitioner in his individual capacity or his capacity of manager of the various insurance companies. In either case, it is clear that such services were in no event performed on behalf of or by the Management Co. Furthermore, petitioner's testimony at trial raised questions as to whether Management Co. had any employees besides himself. Petitioner testified that the bookkeeper was paid by one of the other companies that he managed and was not an employee of the Management Co. He further testified that he was not sure whether the Management Co. employed a pilot in 1965 and 1966. Overall, the evidence tends to show that the Management Co. was run without employees on their payroll.

Also, upon sale of Republic stock in 1966, petitioner agreed to void the contract between Republic and Management Co. If Management Co. was in fact the party in control of the income, petitioner's sale of his interest in Republic would have no effect on the management contract.

The effect of the transaction was to channel income earned by petitioner to a corporation under his control. John K. Shamburger, attorney for petitioner and the Management Co., testified that the corporation was established because most State laws prohibited an insurance executive with power to hire and fire underwriters from receiving compensation based on override commissions. Therefore, the Management Co. was set up to avoid any such problems. Petitioner has failed to prove, however, that upon incorporation the Management Co. took full control of all aspects involved in performing whatever services were required under the contract with Republic. On the contrary, the evidence is overwhelming that the Management Co. had no control over the activities of the petitioner or other individuals who performed services giving rise to the income paid to it. Therefore, we hold that the determination of the respondent must be upheld.

*Issue 3. Failure to File Timely Return*

The third issue is whether the Management Co.'s failure to file a timely corporate income tax return was due to reasonable cause.

Section 6651(a)[7] imposes a penalty for failure to file a required return on or before the prescribed filing date, unless the taxpayer can show that the failure to file was due to reasonable cause and not willful neglect. The taxpayer has the burden of establishing that reasonable cause existed for failing to file a return when due. The facts show only that the Management Co. failed to file its return. There is no evidence to show why such delay occurred. The Management Co. has failed to sustain its burden of proof. Accordingly, respondent's determination is sustained.

*Decisions will be entered under Rule 50.*

---

[7] SEC. 6651. FAILURE TO FILE TAX RETURN.

(a) ADDITION TO THE TAX.—In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), of subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.