**CAMPBELL TAGGART, INC.**

v.

**UNITED STATES of America.**

**No. CA 3–80–0968–C.**

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 1, 1982.

Neil J. O'Brien, Pamela Hobgood Wiese, Gardere & Wynne, Dallas, Tex., for plaintiff.

William W. Guild, Atty. in Charge, Johnny D. Mixon, Atty., Tax Div., Dept. of Justice, Dallas, Tex., Roger M. Moore, Atty. (Southern Region), Tax Div., Dept. of Justice, Washington, D.C., James A. Rolfe, U.S. Atty., Martha Joe Stroud, Asst. U.S. Atty., Dallas, Tex., for defendant.

CORRECTED OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

This is an income tax case which the parties have agreed is of first and last impression.

Plaintiff is a Delaware corporation with its principal place of business in Dallas, Texas. It is a holding company that mainly derives its income from service fees and dividends paid by its 60 domestic and three foreign subsidiaries. These subsidiaries produce and sell food and food related items or service the food industry.

Of the 63 present subsidiaries, 38 were acquired by purchase. This has been Plaintiff's principal mode of breaking into new geographical areas.

On April 7, 1967, the Federal Trade Commission entered a final order compelling Plaintiff to divest itself of four bakeries of the 23 that it had acquired in the previous 10 years. That order also forbade Plaintiff to acquire any new American bakeries without the FTC's permission for a period of 10 years.

Partially because of this ban on domestic growth, Plaintiff has since the late 1960s been interested in international acquisitions. As a result Plaintiff has had extensive discussions with bakers and related industry companies about potential acquisition in many countries.

One subsidiary that Plaintiff has acquired is Bimbo, S.A., a Spanish baker of bread and cake. Plaintiff first acquired a 50% interest in Bimbo from a Mexican national, Sr. Jaime Jorba in early 1971. In 1972, another 1% was acquired by Plaintiff and in 1978, the remaining 49% was acquired.

In 1972, Plaintiff became interested in buying a Spanish supermarket chain by the name of Superdescuento, Uno, Dos, Tres ("Supermarkets") from Sr. Jorba and some Spanish relatives of his.

On December 6, 1972, Plaintiff agreed to purchase 50% of Supermarkets from Sr. Jorba and his relatives. It was agreed that Plaintiff would pay 7,000,000 pesetas to Sr. Jorba and his relatives and contribute 80,-000,000 pesetas to the capital of Supermarkets in return for 50% ownership. Among other terms and conditions of the agreement, Section 1.2 set forth these pre-conditions:

1.2 Before the agreement attached hereto as Exhibit A is executed by JORBA and CTI, it will be necessary for the following conditions to have been met:

(a) The Spanish Government shall have issued those permits necessary for the closing of the transaction described in the agreement attached hereto as Exhibit A, and JORBA and CIT and their respective attorneys shall be satisfied that the form and substance of such permits are sufficient to allow the parties to lawfully enter into the agreement attached as Exhibit A and to complete the transaction contemplated by such agreement;

(b) From the date hereof until the closing under the agreement attached as Exhibit A, CTI (and independent certified public accountants retained by CTI) shall be given access to premises of SUPERDESCUENTO and to its records, and to all information necessary or desirable to understand the historical and current status of SUPERDESCUENTO's business and financial affairs;

(c) From the date hereof until the closing under the agreement attached as Exhibit A, there shall have been, in the opinion of CTI, no materially adverse change in the business, operations, or financial status of SUPERDESCUENTO; and

(d) From the date hereof until the closing under the form of agreement attached hereto as Exhibit A, there shall have been no event or occurrence which would have constituted a default or breach of any representation, warranty, or agreement by JORBA, or legal justification for CTI not to close this transaction under the agreement attached hereto as Exhibit A, if such agreement were in full force and effect at the time of such event or occurrence.

The parties to this agreement were advised by their Spanish lawyers in 1973 that the Spanish Government would look more favorably on the deal if Plaintiff were already a partial owner of Supermarkets. So

the parties signed another agreement on October 10, 1973 by which Plaintiff acquired one-half of Sr. Jorba's interest for 7,000,000 pesetas. On paper this gave Plaintiff 25% of Supermarkets, Sr. Jorba 25% and his Spanish relations 50%. This agreement contained an escape clause that allowed either party to demand the return of the stock in supermarkets for the return of the pesetas if the Spanish Government ultimately refused to approve the deal. This Court will not, of course, comment on the efficacy of the new agreement in the eyes of the Spanish Government. But for the purposes of the Internal Revenue Code of 1954, the Court does not see that this changes the bargain of the parties. The Court will look through this written agreement because the escape clause really left the parties with their original bargain. Also, as there is not the slightest suggestion that the October 10, 1973 agreement was entered into because of its tax consequences in the United States, it will be ignored.

About the same time as this second agreement was signed, it became apparent that the financial condition of Supermarkets had deteriorated significantly and that the outlook for Supermarkets was bleak. Because of this, Plaintiff was advised by counsel that it need not carry out the agreement pursuant to Section 1.2(c), supra.

Plaintiff decided to go through with the deal because it was afraid that to do otherwise would taint its business reputation, goodwill and credibility as an acquirer of businesses. Ample evidence has been presented that Plaintiff has always dealt fairly with those that it has come in contact with. This has resulted in an excellent reputation and a large amount of goodwill for Plaintiff in both the domestic and international marketplaces. Indeed, the parties have stipulated that Plaintiff has never failed to consummate a written agreement.

After learning about Supermarkets' poor financial situation and deciding to conclude the transaction, Plaintiff's officers decided to sell its interest in Supermarkets. Sr. Jorba was advised of this decision on January 18, 1974 and he agreed to sell his and his relatives interest along with Plaintiff.

Starting the week of January 14, 1974, Plaintiff attempted to find a buyer for Supermarkets. Contacts were made in this country, in France and in the Netherlands. Before a buyer was found, approval of the Spanish Government was obtained and the acquisition was carried out on November 20, 1974.

Plaintiff knew on November 20, 1974 that it was paying more for Supermarkets than its market value and that Supermarkets prospects were dim.

Finally, on December 15, 1975, Plaintiff sold its Supermarkets stock for 24,193,314 pesetas. Plaintiff's total loss (including related expenses) amounted to $1,202,908.23.

The parties have stipulated that the legal issues are:

(a) Was the loss realized by taxpayer with respect to acquisition in 1974 and disposition in 1975 of its interest in Superdescuento, Uno, Dos, Tres ("Supermarkets") an ordinary loss or a capital loss?

(b) In the alternative was all or any part of the expenditure by taxpayer in 1974 to acquire the stock of Supermarkets an ordinary and necessary business expense?

(c) The parties agree that the legal expenses incurred in connection with the acquisition and disposition of Supermarkets will be determined in a manner consistent with the Court's decision on issues (a) and (b).

Section 1221 of the I.R.C. of 1954 defines capital assets to be:

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) [as amended by Sec. 514(a), Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487.] a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property.

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hand the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

As the parties agree, as corporate stock is not excepted by one of the subparagraphs of § 1221, it is usually a capital asset. But the Supreme Court has set down the "Corn Products Doctrine" in the case of *Corn Products Co. v. Commissioner,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

The Supreme Court held in that case that an asset, usually considered to be a capital asset, should be treated otherwise in certain instances. The distinction to be made is whether the taxpayer is dealing with the asset as a capital asset or is it being held for some other purpose? Plaintiff's first alternative contention is that an ordinary loss should be allowed on the sale of the Supermarkets stock as it was not holding that stock as a capital asset.

Plaintiff's second alternative is that the expenditures for the stock were ordinary and necessary expenditures for the maintenance of goodwill under § 162 of the 1954 Code and are therefore deductible in the years made. The Supreme Court pointed out in *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933), that these cases . . . "involve the appreciation of particular situations, at times borderline conclusions." So this is primarily a factual determination.

■ Defendant contends that Plaintiff's original intent in signing the December 6, 1972 agreement was to make a capital investment and that that original motivation is the one that is determinative. Plaintiff does not dispute that its original intent was to make an investment in a capital asset. It says though, that at the time that it did make the investment, that the purpose had changed. The result of this change in intent and the escape clauses in the two contracts, in the corporate eyes of Plaintiff, is that Plaintiff was not making a capital investment, but was protecting its goodwill.

The Court agrees with Plaintiff. It would be illogical to hold Plaintiff to its original investment motive when it is clear that it played no part in the consummation of the bargain. Plaintiff was under no legal duty to consummate as soon as it knew of the deterioration of Supermarkets' finances and future. In a sense, it reaffirmed or renewed its bargain at that time but solely for the purpose of protecting its good name.

The remaining question is whether Plaintiff had an ordinary loss under § 165, I.R.C. of 1954 or a business expense under § 162, I.R.C. of 1954.

■ This Court is convinced that the purposes of the Internal Revenue Code are best served by requiring Plaintiff to take an ordinary loss on the sale of the Supermarkets stock in 1975.

■ The normal rule is that the costs of acquiring a capital asset are not deductible when made but are part of the taxpayer's basis in the property.[1] But a taxpayer who pays more than the fair market value for an asset may deduct the excess in some instances. *Jordan v. Commissioner,* 60 T.C. 872 (1973), affirmed, 514 F.2d 1209 (8th Cir.1975), may be cited for the proposition that a taxpayer in this situation, who pays a premium over fair market value for the purpose of protecting his goodwill, may not deduct the premium as a current expense but must include it in his basis in the asset. *Jordan* was a dual motive case. He wanted to acquire the assets and also wanted to protect his good name.

In the present situation, Plaintiff had only the single motive of wanting to preserve its goodwill. It would seem best that in such a situation as this one, that the acquisition costs for the definable asset should all be made part of the taxpayer's basis in the asset. When a taxpayer has carried out a bad bargain to buy an asset in order to protect its goodwill, its intent is still to purchase the asset, only its motivation has changed. The motivation may be sufficient to change the tax consequences from capital gain or loss to ordinary gain or loss, but that is no reason for the expenses not to become part of the basis in the asset.

Any discussion of the reasonableness of or necessity for the expenditure in excess of fair market value will be pretermitted as the issues, above, as framed by the parties appear to subsume the basic reasonableness of Plaintiff's carrying out the transaction.

Also, no discussion of the numerical consequences of this decision will be had as the parties have agreed to work that out between them.

---

1. § 1012, I.R.C. of 1954 reads:

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.